## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| LENORA BONDS, individually and as Independent Administrator of the Estate of TERRANCE HARRIS, | ) ) ) ) ) | |
| Plaintiff, | ) ) | Case No. 16-cv-05112 |
| v. | ) ) ) | Jury Trial Demanded |
| CITY OF CHICAGO, a municipal Corporation, and UNKNOWN OFFICERS | ) ) ) ) | |
| Defendant. | ) ) | |

## COMPLAINT

NOW COMES Plaintiff, LENORA BONDS, Individually and as Independent Administrator of the Estate of her son, TERRANCE HARRIS, by and through her attorneys, The NIXA LAW FIRM, LLC, and for her Complaint against Defendant, CITY OF CHICAGO, pleads as follows:

## INTRODUCTION

1.      On October 23, 2013, Terrance Harris was shot and killed by Chicago Police Officers in his own home. Even though Mr. Harris was unarmed and trying to hide at the time he was killed, officers fired more than 32 bullets at Mr. Harris, striking him 28 times.

2.      At the time of the incident, Chicago police officers were aware that they had been called to the home to assist because Mr. Harris was suffering from a

mental health condition. At no time was Mr. Harris armed with a firearm and at no time did he do anything to justify the use of deadly force.

## JURISDICTION AND VENUE

3.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 1367.

4.     Venue is proper pursuant to 28 U.S.C. § 1391(b). The events giving rise to the claims asserted herein all occurred within this District. Defendant City of Chicago is a municipal corporation located in this District, and Plaintiff and her Decedent reside in this District as well.

## PARTIES

5.     Terrence Harris was a life-long resident of the City of Chicago, and the oldest of his mother's two children. At the time of his death, Mr. Harris was a student at Olive Harvey college.

6.     Lenora Bonds is Mr. Harris' mother. She is a lifelong reside of the City of Chicago and an active member of the community. In addition to raising Mr. Harris and his younger brother, and helping raise several grandchildren, she has worked for nearly thirty years as a full-time employee of a government agency.

7.     Defendant City of Chicago is a municipal corporation under the laws of the State of Illinois.

## FACTUAL ALLEGATIONS

**The Shooting of Terrance Harris**

8.     At the time of his death, Mr. Harris and his mother shared a home at 258 E. 107th Street in Chicago.

9.     On the evening of October 23, 2013, Ms. Bonds called the Chicago Police Department to ask for assistance for her son and informed 911 dispatchers that she believed her son, who had been diagnosed with a mental health issue, was acting strange.

10.     After approximately 30 minutes, several plain clothes officers with the Chicago Police Department arrived at the home.

11.     Ms. Bonds went outside to talk to the officers and explain to them that everything was fine, but that her son was acting differently than normal.

12.     Even though she had not been harmed—and she told officers that no one was hurt and that no one was inside but her son—Chicago police officers broke open her front door (which was unlocked), broke out several windows, and stormed the property.

13.     Several officers proceeded to the basement where Mr. Harris was hiding in a backroom next to the furnace.

14.     Officers surrounded the area where Mr. Harris was hiding. Officers were separated from Mr. Harris by a thin wall that divided the laundry and furnace room from the rest of the basement.

15.     While Mr. Harris crouched next to the furnace attempting to hide, officers with the Chicago police department opened fire from several angles, shooting through the thin wall that separated them from the area where Mr. Harris was hiding.

16.     In total, more than 32 bullets were fired and Mr. Harris was stuck 28 times.

17.     At the time Chicago police officers shot Mr. Harris, he presented no threat to anyone, was surrounded by officers, unarmed, and separated from officers by a wall.

18.     Ms. Bonds, who was held by officers outside, listened as she heard numerous gun shots go off inside of her home.

19.     Mr. Harris died sometime later that evening.

20.     All officers involved in the incident were acting under color of law and in the scope and course of their employment.

21.     In shooting Mr. Harris, Chicago police officers used excessive and unreasonable force.

**Medical Care was Not Timely Provided**

22.     After the shooting, officers did not call or provide medical attention in a timely manner.

23.     Instead, medical attention was not provided to Mr. Harris who was left on the basement floor for a significant period of time before being brought out of the house.

24.     Mr. Harris's suffering was increased and his chances of survival were diminished by the failure of officers on scene to get medical attention quickly or to render aid.

4

**Mr. Harris was Brought Out of the House Through the Basement Window**

25.    During the incident, a number of neighbors from the area came outside to see what the commotion was about.

26.    With dozens of concerned community members gathering in the street in front of the house, and after a significant period of time alone with the body, Chicago police personnel, and possibly other City employees, chose to remove Mr. Harris from the back of the home, which prevented most onlookers from seeing the condition that Mr. Harris was in when he was removed.

27.    Instead of taking Mr. Harris out of the home through the backdoor, which was just feet away from where he was shot, officers and City employees, broke out a ground-level basement window and hoisted Mr. Harris's body out of the home through the window.

28.    The window, after having been repaired, is depicted below:



**Ms. Bonds was Held Unlawfully & Never Told Why Her Son was Killed**

29.     Before Mr. Harris' body was removed from the home, Chicago police officers took Ms. Bonds from the scene and brought her to a Chicago Police station. There, she was questioned repeatedly. She was brought to several different rooms to be questioned in what can only be described as an interrogation.

30.     And even through she had committed no crime and was suspected of committing no crime, she was never allowed to make a phone call, speak to family members, or an attorney, and was kept against her will for a number of hours before she was allowed to leave.

31.     During this time, she was never told that her son had been killed.

32.     In fact, to this day, despite having written several letters, neither the City of Chicago, the Chicago Police Department, the Independent Police Review Authority, nor the State's Attorney's Office have provided Ms. Bonds with any information about why her son was killed by Chicago Police Officers or why he was not provided prompt medical attention.

33.     Likewise, nearly three years later, they have provided her with no information as to the status of their purported investigations into the incident.

34.     In short, she has never received any official explanation about what happened inside of her home that led officers to open fire on her unarmed son.

**The Police Cover Up**

35.     Almost immediately after the shooting, Officers on scene, and shortly thereafter acting in conjunction with supervisors, detectives, and FOP officials,

6

began to create a false narrative to justify why officers entered the house and why officers used deadly force on an unarmed man.

36.     Specifically, the following facts will likely have evidentiary support after a reasonable opportunity for further investigation or discovery: That Chicago police officers conspired and acted to create a false narrative to justify entering the house and/or using deadly force that includes one of more of the following fabrications:

     a.  That Mr. Harris had attacked or injured his mother, when he had not;

     b.  That officers entered the house because they heard a woman scream, when in fact Ms. Bonds was the only other person home and she was outside with the police when they stormed the property;

     c.  That officers entered the home because they smelled natural gas;

     d.  That Mr. Harris attacked officers with a knife, when he did not.

37.     And, once Ms. Bonds did return home, several weeks later, for unknown reasons, members of the Chicago Police Department came by Mr. Bonds home several times and demanded access to the crime scene.

**Ms. Bonds Seeks Answers About Why Her Son Was Killed, Gets None**

38.     Having never received any information about what happened from anyone with the City or the Chicago Police Department, on or about July 28, 2014, Ms. Bonds sent the Chief Administrator of the Independent Police Review Authority a letter asking for answers about what happened.  She never received any response.

39.     Around this time, she also set a letter to the Cook County State's Attorney's Office, which was also ignored.

40.     Traumatized and devastated by her loss and having to live in the house where her first-born son was killed, and without having been provided any answers or response from the City of Chicago or the Chicago Police Department about what happened, Ms. Bonds filed a *pro se* lawsuit in the Circuit Court of Cook County against the City of Chicago seeking answers and damages for the killing of her son by the Chicago Police Department.

41.     This lawsuit was filed within two years of the incident on April 14, 2015.

42.     On November 23, 2015, Ms. Bonds sent a letter to the City of Chicago Law Department, to which she never received an answer.

43.     Believing that someone would help her after the lawsuit was filed, on June 9, 2015, her *pro se* lawsuit in the Circuit Court of Cook County was dismissed without prejudice for want of prosecution when she did not appear for a routine court date that she had not been made aware of.

44.     Ms. Bonds now brings this action within the statutory time period provided by 735 ILCS 5/13-217, seeking both answers and redress for the civil rights violations set forth herein.

## COUNT I – 42 U.S.C. § 1983
### Excessive Force: *Monell* Unconstitutional Policy and Practice Claim Against the City of Chicago

45.     Each Paragraph of this Complaint is incorporated herein.

46.     In the manner described above, the conduct of one of more unknown officers constituted excessive force in violation of the Fourth and Fourteenth Amendments to the United State's Constitution.

47.     The misconduct described in this Count was objectively unreasonable and as undertaken intentionally and with willful indifference to the constitutional rights of Plaintiff and her Decedent.

48.     The misconduct described in this Count was undertaken pursuant to the policy and practice of the Chicago Police Department, in that:

a.     As a matter of both policy and practice, the Chicago Police Department directly encourages and is thereby the moving force behind the very type of misconduct at issue here by failing to adequately train and supervise its officers regarding the use of deadly force on suspects who are suffering from mental health or psychiatric health issues, such that its failure to do so manifests deliberate indifference.

b.     As a matter of both policy and practice, the Chicago Police Department directly encourages and is thereby the moving force behind the very type of misconduct at issue here by failing to adequately train and supervise its officers regarding the use of deadly force when confronting suspects who are either not armed, armed with something other than a firearm, or otherwise present no

justifiable threat to warrant the use of deadly force, such that the City's failure to do so manifests deliberate indifference.

c. As a matter of both policy and practice, the Chicago Police Department directly encourages and is thereby the moving force behind the very type of misconduct at issue here by failing to adequately train and supervise its officers regarding how to interact with and help suspects who are suffering from mental or psychiatric health issues so as not to engender encounters that result in unnecessary uses of force, including deadly force. The City's failure to do so manifests deliberate indifference.

49. As a matter of both policy and practice, the City facilitates the very type of misconduct at issue here by failing to adequately review and discipline prior instances of similar misconduct, thereby leading Chicago Police Officers to believe their actions will never be scrutinized. In failing to discipline or review prior instances of misconduct, the City directly encourages future abuses such as those that took place here.

50. Generally, as a matter of widespread practice so prevalent as to comprise municipal policy, officers of the Chicago Police Department abuse citizens in a manner similar to that alleged by Plaintiff in this Count on a frequent basis, yet the Chicago Police Department and Independent Police Review Authority make findings of wrongdoing in a disproportionately small number of cases.

51. City policy makers, including the Mayor, are aware of, and condone and facilitate by this inaction, a "code of silence" in the Chicago Police Department.

10

Police officers routinely fail to report instances of police misconduct and lie to protect each other from punishment, and go undisciplined for doing so.

52.     The City of Chicago has failed to act to remedy the patterns of abuse, despite actual knowledge of the same, thereby causing the types of injuries alleged here.

53.     As a matter of express policy, the City fails to utilize records that it keeps to identify and respond to patterns of misconduct by officers.

54.     As a matter of express policy, the City refuses to take into consideration patterns of allegations of civil rights violations when evaluating the merits of any particular complaint. In other words, the City does not consider whether an officer has been accused of a particular type of misconduct at issue when determining whether any subsequent complaint for the same type of conduct at issue is evaluated.

55.     The aforementioned express and implied policies, practices, ad/or customs of the City have been maintained and/or implemented with utter indifference by the City and have encouraged and/or motivated the unknown officers involved in the shooting of Plaintiff's Decedent to commit the aforesaid wrongful acts, and therefore acted as the direct and proximate cause of the injuries sustained by Plaintiff and her Decedent.

56.     As a direct result of the facts and allegations set forth in Count I, Plaintiff and her Decedent suffered injuries.

**COUNT II – 42 U.S.C. § 1983**
**False Arrest: *Monell* Unconstitutional Policy and Practice Claim Against the City of Chicago**

57.     Each Paragraph of this Complaint is incorporated herein.

58.     As described more fully above, one of more unknown officers falsely arrested and detained Mr. Harris and Ms. Bonds without justification and without probable cause in violation of the Fourth and Fourteenth Amendments to the United States Constitution.

59.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to the constitutional rights of Plaintiff and her Decedent.

60.     The misconduct described in this Count was undertaken pursuant to the custom, police, and/or practice of the Defendant City of Chicago, such that Defendant City of Chicago is also liable, as described above.

61.     As a result of the misconduct described in this Count, undertaken pursuant to the City's policy and practice as described above, Plaintiff and her Decedent suffered injuries, including emotional harm.

**COUNT III– 42 U.S.C. § 1983**
**Unlawful Search and Seizure: *Monell* Unconstitutional Policy and Practice Claim Against the City of Chicago**

62.     Each Paragraph of this Complaint is incorporated herein.

63.     As described more fully above, one of more unknown officers violated Plaintiff and her Decedent's Fourth Amendment right to be free from unreasonable

search and seizure by seizing Plaintiff and her Decedent without probable cause and by conducting an illegal search of her residence.

64. The misconduct described in this court was undertaken pursuant to the custom, policy, and/or practice of the Defendant City of Chicago, such that the City of Chicago is liable, as described above.

65. As a result of the misconduct described in this Count, undertaken pursuant to the City's policy and practice as described above, Plaintiff and her Decedent suffered injury, including physical and emotional harm, and significant damage to Plaintiff's home and property.

## COUNT IV– 42 U.S.C. § 1983
## Denial of Medical Care: *Monell* Unconstitutional Policy and Practice Claim Against the City of Chicago

66. Each Paragraph of this Complaint is incorporated herein.

67. As described more fully above, one of more unknown officers knew that Plaintiff's Decedent needed medical care, both for psychiatric problems he was experiencing and after he was shot, but medical care was not provided and/or was not timely provided to Plaintiff's decedent. As a result, Plaintiff's Decedent's rights under the Fourth and Fourteenth Amendments were violated.

68. The failure to provide timely medical care was done with deliberate indifference to Plaintiff's Decedent's objectively serious medical needs, and their acts were undertaken with deliberate indifference to the rights of Plaintiff and her Decedent.

13

69.     The failure to provide timely medical care described in this Count was undertaken pursuant to the custom, policy, and/or practice of the Defendant City of Chicago, such that the City of Chicago is liable, as described above.

70.     As a result of the misconduct described in this Count, undertaken pursuant to the City's policy and practice as described above, Plaintiff and her Decedent suffered injury, including physical and emotional harm.

71.     The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to the constitutional rights of Plaintiff and her Decedent.

## COUNT V– Illinois Law
## Damage to Property

72.     Each Paragraph of this Complaint is incorporated herein.

73.      As described more fully above, one of more unknown officers caused significant damage to Plaintiff's home, including breaking windows, breaking down her door, shooting her son, shooting holes through her walls, and otherwise making her home unfit for human habitation.

74.     And while the home will never be the same, and the City made some efforts at cleaning up the basement and fixing the damage, the City stopped well short of restoring the property to anywhere near what it was before the misconduct above occurred.

75.    The misconduct above in which Plaintiff's home was badly damaged was done with willful and wanton disregard for Plaintiff and was done with reckless disregard for her rights.

76.    As a result of this misconduct, she suffered damages, including the loss of use and enjoyment of her home for which she still suffers.

77.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to the constitutional rights of Plaintiff and her Decedent.

78.    The misconduct described in this Count was undertaken pursuant to the custom, police, and/or practice of the Defendant City of Chicago, such that Defendant City of Chicago is also liable, as described above.

79.    As a result of the misconduct described in this Count, undertaken pursuant to the City's policy and practice as described above, Plaintiff and her Decedent suffered injuries, including emotional harm.

WHEREFORE, Plaintiff demands judgment against the City of Chicago in a sum in excess of $1,000,000.00, plus costs, attorneys' fees, and any other relief the Court deems just and appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Dated: May 10, 2016                          Respectfully submitted,


/s/ Daniel Nixa
*Attorney for Plaintiff*

Daniel Nixa
The Nixa Law Firm, LLC
444 N. Michigan Ave., Suite 1200
Chicago, IL 60611
(312) 870-0393
dan@nixalawfirm.com