IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LENORA BONDS, as Independent Administrator of the Estate of TERRANCE HARRIS, <br><br> Plaintiff, <br><br> v. <br><br> CITY OF CHICAGO, a municipal Corporation, <br><br> Defendant. | Case No. 16-cv-05112 <br><br> Judge Gottschall <br><br> Jury Trial Demanded |

**<u>FIRST AMENDED COMPLAINT</u>**

NOW COMES Plaintiff, LENORA BONDS, as Independent Administrator of the Estate of her son, TERRANCE HARRIS, by and through her attorneys, the NIXA LAW FIRM, LLC, and HENDERSON PARKS, for her First Amended Complaint against Defendant, CITY OF CHICAGO, pleads as follows:

**INTRODUCTION**

1. On the evening of October 23, 2013, Terrance Harris was shot 29 times by Chicago Police officers while suffering from an acute episode caused by a diagnosed mental illness.

2. At the time he was killed, Mr. Harris was surrounded by Chicago Police officers and hiding in the furnace room in the basement of his mother's home.

3. The officers' use of force on Mr. Harris was avoidable, unjustified, and objectively unreasonable.

4. In shooting Mr. Harris, Chicago Police officers violated Mr. Harris' Fourth and Fourteenth Amendment rights.

## JURISDICTION AND VENUE

5. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 1367.

6. Venue is proper pursuant to 28 U.S.C. § 1391(b). The events giving rise to the claims asserted herein all occurred within this District. Defendant City of Chicago is a municipal corporation located in this District, and Plaintiff and her Decedent reside in this District as well.

## PARTIES

7. Lenora Bonds is Terrance Harris' mother and the Independent Administrator of his estate.[1] She is a lifelong reside of the City of Chicago.

8. In addition to raising Mr. Harris and his younger brother, and helping raise several grandchildren, she has worked for nearly thirty years as a full-time employee of a government agency.

9. Defendant City of Chicago is a municipal corporation formed under the laws of the State of Illinois.

10. The City of Chicago employed the Chicago Police officers who caused the underlying constitutional deprivation while acting under color of state law.

---

[1] Ms. Bonds' Petition for Letters of Administration is currently pending before the Circuit Court of Cook County (Case No. 17-P-1665).

## FACTUAL ALLEGATIONS

**The Unconstitutional Shooting of Terrance Harris**

11. On the evening of October 23, 2013, Terrance Harris' mother, Ms. Bonds, called 911 during an altercation with Mr. Harris.

12. Mr. Harris had been diagnosed with a mental illness and was suffering from an acute mental health episode.

13. The Chicago Police Department was dispatched to her address at approximately 10:30 p.m.

14. When officers arrived on scene, Mr. Harris refused to open the door.

15. From outside the home, at least one officer heard Mr. Harris making nonsensical statements about a "Mason" and "Israelites."

16. Officers eventually attempted to make a forced entry into the home using a sledge hammer and a "Chicago bar" to break down the front door.

17. Based on information and belief, and according to police reports, as the front door was forced open, a Chicago police sergeant stepped into the entryway and Mr. Harris cut him with a knife.

18. The sergeant and the other officers then retreated to the driveway and Mr. Harris locked the storm door behind them.

19. The officers on scene radioed for help and dozens of additional officers from across the district descended on the scene, including at least three Chicago Police sergeants and possibly one or more lieutenants.

3

20. With dozens of officers amassed outside, Ms. Bonds then exited the home.

21. Ms. Bonds informed officers outside that Mr. Harris was hiding in the basement and that he was off of his medication.

22. This information was explicitly communicated to a sergeant who then broadcasted the information over the radio to the other officers on scene.

23. In addition to the information provided by Ms. Bonds, both the Chicago Police Department and the Office of Emergency Management Communication ("OEMC" or "911 dispatch") knew, or should have known, from prior calls to that address that Mr. Harris suffered from mental health issues.

24. With Mr. Harris alone inside the home, which was completely surrounded by dozens of armed officers, no attempt was made to negotiate with him or induce him to come out of the house and surrender peacefully.

25. No plan was put in place to try to apprehend him without the need for lethal force.

26. At no point did any police dispatcher or Chicago Police officer notify or attempt to notify CPD's Crisis Intervention Team to the scene.

27. Instead, a few moments after Ms. Bonds exited the home at least a dozen officers, including at least one sergeant, stormed the home with their guns drawn and proceeded to the basement where Mr. Harris was hiding.

28. Officers who entered the basement did so without formulating a plan.

4

29. Once in the basement, the officers surrounded the furnace room where Mr. Harris was hiding.

30. Officer Skarupinski, a then 29-year-old tactical officer, visualized Mr. Harris through the doorway of the furnace room.

31. Officer Skarupinski observed Ms. Harris armed with a knife learning up against the wall near the furnace approximately 22 feet away.

32. Officers in the basement made no attempt to negotiate with Mr. Harris or induce him to surrender peacefully.

33. No effort was made by officers in the basement to de-escalate the situation.

34. Instead, Officer Skarupinski entered the furnace room with his weapon drawn with several officers behind him and told Mr. Harris to "drop the knife."

35. When Mr. Harris said no, Officer Skarupinski advanced toward Mr. Harris who was against the wall.

36. At the time Officer Skarupinski entered the furnace room, the furnace room was completely surrounded by armed officers.

37. Mr. Harris did not present an immediate threat to any officer or person, and he was not attempting to flee, nor could he.

38. After entering the furnace room, Officer Skarupinski converged on Mr. Harris, traveling more than 15 feet from the entrance of the furnace room to within three to five feet of Mr. Harris who was near the adjacent wall.

39. When Officer Skarupinski got within three to five feet of Mr. Harris, he opened fire.

40. Two other officers also fired their weapons at Mr. Harris, firing a total of 32 shots and striking Mr. Harris 29 times including twice in the back of the head.

41. The shooting of Terrance Harris was avoidable, unjustified and objectively unreasonable.

42. In the manner described above, the conduct of the Chicago Police officers on scene, including Officers Skarupinski, Lopez, and Williams, each of whom fired at Mr. Harris, and supervisors on scene who abdicated their responsibility to direct those under their command, violated Mr. Harris' constitutional right to be free from excessive force under the Fourth and Fourteenth Amendments.

43. The unconstitutional use of force on Mr. Harris was the result of several interrelated *de facto* policies, practices, and customs of the City of Chicago, which include (1) the City's failure to adequately implement a Crisis Intervention Team program, (2) its longstanding failure to supervise and discipline its officers, and (3) its encouragement and condonation of a "code of silence" among officers, pursuant to which Chicago Police officers refused to report or otherwise covered-up instances of police misconduct.

## COUNT I – 42 U.S.C. § 1983
### Fourth Amendment Excessive Force

44. Each Paragraph of this Complaint is incorporated herein.

*Failure to Adequately Implement a Crisis Intervention Team Program*

45. At all relevant times the City of Chicago failed to have in place adequate policies concerning encounters between police officers and people who suffer from mental illness, especially those who may be experiencing a mental health crisis.

46. First and foremost, this includes the City's failure to adequately implement its Crisis Intervention Team ("CIT") program.

47. In 2005, following a series of well publicized police shootings of persons with mental illness, the City adopted a CIT program that was modeled after the program designed by the University of Memphis, the leader in the field.

48. Among other things, a properly implemented CIT program provides (1) a sufficient number of CIT trained officers to handle mental health related calls, (2) adequate tools for 911 call takers to identify calls likely to involve someone experiencing a mental health crisis, and (3) a means for CIT trained officers to be identified by dispatchers and dispatched to such calls.

49. Chicago's CIT program was designed around the "Memphis Model," and adopted based on recommendations set forth by a Mental Health Task Force, initiated by former CPD Superintendent Philip Cline.

50. The Chicago Police Department began pilot testing its CIT program in 2005 in two districts, and eventually expanded it city-wide.

51. In 2006, the police department was training up to 30 officers per month.

7

52. Unfortunately, following Superintendent Cline's departure in 2007, CPD leadership and City officials failed to make the CIT program a priority. Support for the program dwindled and the prospect for a successful implementation died on the vine.

53. For example, from 2007 to 2016, the Critical Response Unit, which was responsible for managing and implementing the CIT Program, had its staff cut by 60% and officer participation in the CIT program declined precipitously.

54. Funding for the CIT program was also inadequate, with CPD failing to request adequate funding from City Council, and City Council failing to provide sufficient funding for the program to be effective.

55. Indeed, since its initial inception, as of 2016 only 18% of Chicago's more than 12,000 police officers have been certified by the Illinois Law Enforcement Training and Standards Board as CIT officers, which is half of what the University of Memphis model calls for as best practices in large cities such as Chicago.

56. Because of its failure to adequately implement its CIT program, CPD lacked a sufficient number of CIT trained officers to handle mental health related calls. For example, out of the 60,000 calls in 2010 and 2012 that OEMC initially identified as "mental health-related," only a quarter of them were handled by CIT officers.

57. In addition to having enough CIT trained officers, a central component of an adequately implemented CIT program is having a system in place that allows

911 dispatchers to identify mental health related calls and dispatch CIT trained officers to them.

58. At all relevant times, the City of Chicago failed to have adequate policies, procedures, and tools in place at its 911 dispatch center (known as the Office of Emergency Management Communication or "OEMC") to allow dispatchers to adequately identify calls involving people in mental health crises. And even when those calls were identified, OEMC lacked the ability to accurately identify which officers were CIT trained on any given shift.

59. The deficiencies in the City of Chicago's implementation of its CIT program are widely recognized. Following the shooting of Laquan McDonald, in 2016, the City assembled a panel of experts who were handpicked by City officials, including the Mayor, which was known as the Police Accountability Task Force ("Task Force"). The Task force conducted a 360-degree review of the Chicago Police Department. In conducting its work, the Task Force formed working groups, reviewed primary source materials provided by the City, conducted research, interviewed experts, and developed and drafted recommendations.

60. One of the primary conclusions of the Task Force was that Chicago's approach to CIT, including the implementation of its CIT program, was woefully inadequate.

61. Since the Task Force Report's release, City officials have publicly acknowledged the validity of the Task Force's findings.

62. Moreover, following its investigation into the Chicago Police Department, in 2017 the U.S. Department of Justice ("DOJ") found that the City of Chicago's CIT program was deficient in a number of ways, which has caused officers to use unconstitutional force on a meaningful number of people who were experiencing a mental health crisis. The DOJ concluded that this has contributed to an overall pattern and practice of unconstitutional use of force by CPD.

63. CPD has also publicly acknowledged the deficiencies in the implementation of its CIT program. In 2014, then Deputy Superintendent Alfonza Wysinger testified before Congress that in 2012 "because no more than 20% of [Chicago's] patrol officers [were] CIT-trained, less than a majority of mental health related calls were responded to by a CIT-trained officer. Thus the outcomes of many thousands of mental health related calls were not benefited by interaction with an appropriately trained officer, and thereby adding unnecessary risk of physical altercation and bodily harm during those calls[.]"

64. When implemented properly, CIT programs are highly effective in reducing the unnecessary use of force on people experiencing mental health crises.

65. CIT officers are trained to identify people suffering from mental health crises and to use tactics in the field to de-escalate situations to avoid the unnecessary use of force.

66. A National Institute of Mental Health Funded research study found significant differences in how Chicago's CIT-trained officers responded to persons

experiencing a mental health crisis compared to their Non-CIT trained counterparts.

67. The City's failure to adequately implement its CIT program resulted in constitutional violations for which the City was aware, or should have been aware, including the violation at issue in this case.

68. Moreover, in addition to actual constitutional violations, the failure of the City of Chicago to adequately implement its CIT program created a substantial likelihood of imminent constitutional deprivations such as the one that resulted in this case.

69. At all relevant times, the City of Chicago's final policy maker was deliberately indifferent to the problems and risks created by the City's failure to adequately implement its CIT program.

*Failure to Investigate, Supervise, and Discipline*

70. As a matter of both policy and practice, at all relevant times, the City of Chicago facilitated, condoned, and encouraged the very type of misconduct at issue in this case by failing to adequately investigate, punish, supervise, control, transfer, and discipline officers who committed misconduct, including excessive force and the unjustified use of lethal force, against the residents of the City of Chicago.

71. As a result of these policies, including the City of Chicago's failure to investigate and discipline officers for prior instances of misconduct, including excessive force, officers were led to believe that their actions will never be

11

scrutinized and, in that way, the City of Chicago directly encouraged abuses such as those at issue in this case with respect to Mr. Harris.

72. At all relevant times, Chicago police officers accused of excessive force could be confident and assured that the Independent Police Review Authority ("IPRA") would not sincerely investigate accusations of misconduct, and would refuse to recommend discipline even where an officer has engaged in excessive force.

73. On this score, the numbers speak for themselves:

    a. Over the last decade, African Americans were ten times more likely to be shot by Chicago police officers than white Chicagoans.

    b. Since its inception in 2007 to July 2014, IPRA investigated approximately 312 shootings by Chicago police officers. Of the 158 investigations of "officer involved shootings" that were completed, only one officer was found to have violated any department rule, and in that single case IPRA found that "extraordinary circumstances" mitigated his actions.

    c. At least 21 Chicago police officers are currently still employed by the department, some with honors (including the officers who shot Mr. Harris), despite having shot citizens under highly questionable circumstances, resulting in payments by the City totaling at least $30.2 million to settle lawsuits;

    d. At least 500 Chicago police officers with more than 10 misconduct complaints over the five-year period from 2001 to 2006 are still employed by the department and six officers who have shot and killed

12

civilians also have a large number of complaints of misconduct, for which they have not received any penalty, discipline, supervision or re-training.

74. In the years leading up to Mr. Harris' death in 2013 these policies and practices were in full swing.

75. For example, according to IPRA there were 58 investigations into CPD shootings in 2011 alone, more than one shooting incident for every week of the year; these incidents involved the injuring of 37 people and the killing of 23 (a total of 60 people), and yet, upon information and belief, not one officer involved in those shootings was disciplined.

76. According to IPRA there were 50 investigations into CPD shootings in 2012 alone, almost one shooting incident for every week of the year; these incidents involved the injuring of 49 people and the killing of 8 (for a total of 57 people), and yet, upon information and belief, not one officer involved in those shootings was disciplined

77. The investigation into Mr. Harris' death illustrates these deficiencies. For instance, IPRA did not review or analyze the OEMC audio related to the incident. It did not take into account the fact that it was known to officers on scene that Mr. Harris was suffering from a mental illness at the time of his death. IPRA did not question or investigate the reason that neither officers on scene nor 911 dispatchers directed a CIT trained officer to the scene. It did not question in any meaningful way the officers' decision to enter the furnace room without a plan in

place. IPRA did not review the video of the scene that was filmed by evidence technicians after the shooting.

78. Municipal policymakers have long been aware of the City's policy and practice regarding shootings by CPD, and of the City's failures to properly supervise, monitor, and discipline its police officers.

79. For example, based on information and belief, Officer Skarupinski, who fired 16 shots at Mr. Harris, has been involved in two misconduct lawsuits that cost the City more than $637,501, and Officer Lopez, who fired 13 shots at Mr. Harris, has been named in at least 16 citizen complaints.

80. As a matter of express policy, at all relevant times, the City refused to take into consideration patterns of allegations of civil rights violations when evaluating the merits of any particular complaint. In other words, if a police officer was accused of the same kind of misconduct multiple times within the seven-year retention period, IPRA would not consider those allegations if they had been deemed unsustained.

81. City officials failed to act to remedy the patterns of abuse described in the preceding Paragraphs, despite actual knowledge of the same, thereby causing the types of injuries alleged here.

82. In 2016, the Task Force identified a litany of problems in the way that CPD supervises, disciplines, and controls its officers and concluded that IPRA was a had failed in its core mission.

83. Since the Task Force report was released, City officials, including the mayor, have publicly acknowledged the validity of its findings.

84. Moreover, in its 2017 report the DOJ found that CPD engaged in a pattern and practice of using unconstitutional force on residents of the City of Chicago. It reached the same conclusions as the Task Force with respect to the City's failure to adequately investigate, punish, supervise, control, transfer, and discipline officers who commit misconduct, including excessive force and the use of lethal force against Chicago residents.

85. At all relevant times, the City's final policy maker was aware of these problems but was deliberately in different to them. For example, in the five years prior to Mr. Harris' death, the City Council's Committee on Police and Fire, which was responsible for overseeing IPRA and the police department, failed to hold even a single committee meeting to discuss police shootings, officer discipline, the use of excessive force, or IPRA.

*Code of Silence*

86. As part and parcel of the aforementioned *de facto* policies, at all relevant times, a policy, practice, and custom of a "police code of silence" existed within CPD.

87. At all relevant times, this code of silence resulted in police officers refusing to report instances of police misconduct of which they are aware, including the unjustified shooting of Chicago residents, despite their obligation under police regulations to do so. The code of silence also includes police officers either

15

remaining silent or giving false and misleading information during official investigations in order to protect themselves or fellow officers from internal discipline, civil liability or criminal charges, in cases where they and their fellow officers have used excessive force and/or engaged in unjustified shootings of civilians.

88. For example, in *Obrycka v. City of Chicago*, 2012 WL 11047181 (N.D. Ill.), the longstanding and widespread CPD code of silence was exposed when video tape and cellular phone evidence revealed Chicago Police officers trying to cover up and conceal a fellow officer's vicious beating of a female bartender within the City of Chicago. The *Obrycka* jury found that the City had either (1) a widespread custom or practice of failing to investigate or discipline its officers; (2) a widespread custom or practice of a police code of silence; or (3) both; and a judgment was entered against the City.

89. Time and again the existence of a police code of silence has been proven and has been acknowledge by City officials, yet municipal policy makers have failed to remedy it. For example, both Mayor Daley and Mayor Emanuel have publicly acknowledged the existence of a code of silence within CPD. And the Task Force found that a code of silence exists and its finding was acknowledged as valid by City officials, including the Mayor.

90. Likewise, the DOJ reached the same conclusions as the Task Force with respect to the existence of the code of silence and the City's failure to remedy the same.

91. The *de facto* policies, practices and customs of the City's failure to investigate, punish, supervise, control, transfer, and discipline officers who commit misconduct, including excessive force and the code of silence are interrelated and exacerbate the effects of each other. In the words of former Office of Professional Standards ("OPS") Director Fogel, these policies, practices "institutionalize police lying" and "immunize police officers from discipline." And as both the Task Force and DOJ concluded, these policies remained unchanged even after IPRA supplanted OPS in 2007.

92. The aforementioned policies, practices and customs of failing to investigate, punish, supervise, control, transfer, and discipline officers who commit misconduct, including excessive force and the police code of silence, separately and together, proximately caused injury to Mr. Harris and his Estate in this case, among other reasons, because the officers involved had good reason to believe that their misconduct would not be revealed or reported by fellow officers or their supervisors, that these denials would go unchallenged by these supervisors and fellow officers, from the police Superintendents, Police Board, and Directors of IPRA on down, and that they were immune from disciplinary action, as has proven to be the case, thereby protecting them from the consequences of their unconstitutional conduct.

93. The officers involved engaged in the conduct that resulted in the shooting and death of Mr. Harris because they knew they would be protected, both

by fellow officers, by the City, and by CPD, from serious consequences of their conduct.

WHEREFORE, Plaintiff demands judgment against the City of Chicago for compensatory damages, plus costs, attorneys' fees, and any other relief the Court deems just and appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by jury pursuant to Federal Rule of Civil Procedure 38(b) on all issues so triable.

Dated: March 22, 2017                    Respectfully submitted,

/s/ Daniel Nixa
THE NIXA LAW FIRM
444 N. Michigan Ave., Suite 1200
Chicago, IL 60611
(312) 870-0393
dan@nixalawfirm.com

Victor P. Henderson
Rebecca R. Kaiser
HENDERSON PARKS
140 S. Dearborn Street, Suite 1040
Chicago, IL 60606
Telephone: (312) 262-2900
Facsimile:  (312) 262-2901

*Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that on March 22, 2017, I served a copy of **Plaintiff's First Amended Complaint** on counsel for Defendant by filing the same on the Court's ECF system.

<u>/s/ Daniel Nixa</u>