UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LENORA BONDS, individually and as Independent Administrator of the Estate of TERRANCE HARRIS, <br><br> Plaintiff, <br><br> v. <br><br> CITY OF CHICAGO, <br><br> Defendant. | Case No. 16-CV-5112 <br><br> Judge Joan B. Gottschall |

## MEMORANDUM OPINION AND ORDER

Chicago police officers shot Terrance Harris ("Harris"), killing him, on either October 22 or 23, 2013 (the date is disputed). *See* Ans. to 1st Am. Compl. ¶¶ 1, 13, ECF No. 36 ("Ans."). According to the First Amended Complaint ("FAC"), Harris had been diagnosed with a mental health condition and was experiencing "an acute mental health episode" at the time. FAC ¶ 12, ECF No. 34. His mother, Lenora Bonds ("Bonds" or "plaintiff"), brought this action against the City of Chicago ("the City") under 42 U.S.C. § 1983 and the Fourth and Fourteenth Amendments. *Id.* ¶ 7. She claims the officers involved used excessive force and that the shooting "was avoidable, unjustified and objectively unreasonable." *Id.* ¶¶ 41–42. There are no individual officers sued as defendants in this case.

The City moves under Federal Rule of Civil Procedure 42(b) to split the trial and discovery into two phases. Def.'s Mot. to Bifurcate Issues, ECF No. 47. The first would be a liability phase in which a jury would determine whether a constitutional violation occurred. *Id.* at 1. The second phase, if necessary, would be devoted to the question of whether the City should be held liable for the violation under *Monell v. Dep't of Social Services of City of New*

*York*, 436 U.S. 658 (1978). ECF No. 47 at 1. For the following reasons, the court denies the motion.

## I. BACKGROUND

The court recites the allegations in the complaint solely to provide background and context. Where appropriate, the court cites the City's answer establishing facts it admits are true.

### A. Factual Allegations

Bonds called 911 on the night in question "during an altercation with Mr. Harris." Ans. ¶ 11. Chicago police officers were dispatched, and Harris refused to let them in. *Id.* ¶¶ 13–14. The officers forced their way in using "entry tools." *Id.* ¶ 16. Plaintiff alleges that Harris used a knife to cut a sergeant in the face as he came through the door. *Id.* ¶ 17.

The officers retreated to the driveway and radioed for assistance. *Id.* ¶¶ 18–19 (some facts per police reports). Meanwhile, according to police reports, Harris closed and locked the storm door. *Id.* ¶ 18. After some time (the pleadings do not make clear how much), Bonds came outside. FAC. ¶ 20. She told them that Harris was hiding in the house's basement and that he was "off of his medication." Ans. ¶ 21 (per police report). The City admits this information was "communicated to a sergeant, who then relayed the information over the radio to officers on the scene." *Id.* ¶ 22.

Plaintiff alleges that, moments later, several officers stormed the house with guns drawn and went to the basement. FAC ¶ 27; *see also* Ans. ¶ 27 (admitting entry with weapons drawn). Harris was hiding in a furnace room; the officers surrounded him, according to the complaint. FAC ¶ 29. One officer, identified as "Officer Skarupinski" in the complaint, saw Harris holding a knife. Ans. ¶ 31. Plaintiff alleges that the officers never tried to negotiate with Harris, de-escalate the situation, or resolve it peacefully. FAC ¶¶ 32, 33. Gun still drawn, Skarupinski

2

entered the furnace room and told Harris to drop the knife. Ans. ¶ 34. Harris refused. *Id.* ¶ 35. The officer opened fire. *Id.* ¶ 39. Two other officers opened fire. *Id.* ¶ 40. Bonds alleges that in all, they fired thirty-two shots, twenty-nine of which struck Harris. FAC ¶ 40.

**B. Monell Claims**

The court has explained *Monell* before in this case:

> Section 1983 provides a cause of action against any person who, acting under color of state law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. A municipality is liable under § 1983 "when execution of [its] policy or custom, whether made by its lawmakers or by those whose edicts may fairly be said to represent official policy, inflicts the injury." *Monell*, 436 U.S. at 694. Municipal liability can rest on: (1) an express policy that caused the constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled that it constitutes a policy; or (3) that the constitutional injury was caused by a person with final policymaking authority. *Lewis v. City of Chicago*, 496 F.3d 645, 656 (7th Cir. 2007).
>
> . . . There is no bright-line rule for determining when conduct rises to the level of policy or practice but "it is clear that a single incident—or even three incidents—do not suffice." *Wilson v. Cook Cnty.*, 742 F.3d 775, 780 (7th Cir. 2014); *see also Palka v. City of Chicago*, 662 F.3d 428, 435 (7th Cir. 2011) ("two alleged instances of discrimination do not constitute a widespread pattern or practice sufficient to subject the City to liability"); *Nettles-Bey v. Burke*, No. 11 C 8022, 2015 WL 4638068, at *12 (N.D. Ill. Aug. 4, 2015) ("Isolated incidents of allegedly unconstitutional conduct are insufficient to establish a widespread practice."); *Falk v. Perez*, 973 F. Supp. 2d 850, 864 (N.D. Ill. 2013) ("[B]y alleging 'widespread practices,' 'customs,' and 'unofficial policies,' plaintiff merely states boilerplate legal conclusions that are the elements of her *Monell* claim."). A plaintiff also must be able to show that the municipality's policy was the "moving force" behind the alleged injury; that is, a plaintiff "must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997); *see also City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Teesdale v. City of Chicago*, 690 F.3d 829, 833 (7th Cir. 2012).

*Bonds v. City of Chicago*, No. 16 C 5112, 2017 WL 698680, at *7 (N.D. Ill. Feb. 22, 2017), *vac'g* 2017 WL 106044 (N.D. Ill. Jan. 11, 2017).

Bonds pleads three customs and policies in her FAC. The first concerns the City's Crisis Intervention Team ("CIT") program for interactions involving police and people experiencing mental illness. *See* FAC ¶¶ 45–69. In short, plaintiff alleges that the City began implementing its CIT program in 2005, but it stalled after a change in leadership at the Chicago police department in 2007, leaving the program underfunded and short staffed. *See id.* ¶¶ 50–58. Second, Bonds pleads that "[a]s a matter of both policy and practice, at all relevant times, the City of Chicago facilitated, condoned, and encouraged the very type of misconduct at issue in this case by failing to adequately investigate, punish, supervise, control, transfer, and discipline officers who committed misconduct, including excessive force and the unjustified use of lethal force, against the residents of the City of Chicago." *Id.* ¶ 70; *see also id.* ¶¶ 70–79. Bonds also pleads that a "code of silence" exists in the Chicago Police Department under which officers refused to report fellow officers' misconduct. *Id.* ¶¶ 86–89.

## II. PROCEDURAL STANDARD

The court has discretion to bifurcate the claims as the City requests and to stay discovery on the *Monell* claim until the claims against the officer defendants are resolved. *Medina v. City of Chicago*, 100 F. Supp. 2d 893, 894 (N.D. Ill. 2000); *see also* Fed. R. Civ. P. 42(b); 16(b)(3). The Federal Rules of Civil Procedure allow the court to order separate trials "where the efficiency of a consolidated trial is outweighed by its potential prejudice to the litigants." *Houskins v. Sheahan*, 549 F.3d 480, 495 (7th Cir. 2008). The applicable inquiry requires the court to look to the case's "peculiar facts and circumstances" and weigh "considerations of convenience, economy, expedition, and prejudice." *Id.*; *see also Krocka v. City of Chicago*, 203

F.3d 507, 516 (7th Cir. 2000) (citing *Houseman v. U.S. Aviation Underwriters*, 171 F.3d 1117, 1121 (7th Cir. 1999)) (bifurcation may not impinge on Seventh Amendment rights).

### III. ANALYSIS

Bifurcation of *Monell* issues in § 1983 actions frequently expedites the disposition of the case, since the resolution of the claims against the individual officers may end the entire case (either because no infringement of plaintiff's constitutional rights is established or because the plaintiff is able to settle the case in a way that persuades him not to go further), after less complex discovery and a less complex trial. *Medina*, 100 F. Supp. 2d at 895; *see also Swanigan v. City of Chicago* (*Swanigan I*), 775 F.3d 953, 963 (7th Cir. 2015), *aff'd after remand Swanigan v. City of Chicago* (*Swanigan II*), 881 F.3d 577 (7th Cir. 2018) (commenting that "[t]he stipulation and stay of the *Monell* suit in this case achieved the goal of avoiding unnecessary complexity and effort").

There are considerations that militate against bifurcation, however. There are circumstances where resolution of the claims against the individual officers does not eliminate the need for a trial of the *Monell* claim. *See Medina*, 100 F. Supp. 2d at 896. And if, after discovery and a trial on the individual claims, it is necessary to begin discovery again and try the *Monell* claim, the result of the bifurcation will be a longer and more complex road to the case's disposition, including a second trial that is largely repetitive of the first. Moreover, there are non-economic benefits that flow from discovery (as well as a possible trial) of the *Monell* claim. Chiefly, an airing of the *Monell* claim through discovery assures transparency, and if problems in the City's policies and practices are revealed through discovery or trial, the likelihood of deterring future misconduct is significantly enhanced. *See generally Medina*, 100 F. Supp. 2d at

896–97. As is explained below, these non-economic benefits and the particular circumstances of this case lead the court to deny the motion to bifurcate at this stage.

As the parties acknowledge, this case is something of a unicorn because, unlike the vast majority of § 1983 excessive-force actions, this case does not, and cannot, involve any claims against the individual officers involved in Harris' shooting. This mitigates two risks of bifurcation—the risk that the officers' qualified immunity defenses will not resolve the *Monell* claims, and the risk that the municipality will not concede the point after the first phase and litigate whether an officer acted in the course and scope of employment. *See Clarett v. Suroviak*, No. 09 C 6918, 2011 WL 37838, at *2 (N.D. Ill. Jan. 3, 2011) (Gottschall, J.). On the other hand, bifurcation here will not reap the ordinary benefit of avoiding potential prejudice to the individual officers of airing *Monell* issues in a single trial. *See id.*

The absence of individual officers also decreases the likelihood that the first phase will eliminate the need for further discovery and litigation on *Monell* issues. The City asserts the proposition as an *ipse dixit* in its motion. *See* ECF No. 47 at 3 ("Only if a jury determines that the use of force against Harris was unreasonable can Plaintiff prevail on her *Monell* claims."); *id.* at 8–9 (substantially same). The City almost certainly refers to the manner in which an individual officer's use of force is analyzed, an inquiry that examines the facts of which the officer was actually aware. *Graham v. Connor*, 490 U.S. 386, 397 (1989) ("[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." (citations omitted)). Understood this way, the City proposes a first phase limited to the "facts and circumstances" of the night of the shooting.

But Bonds has demonstrated that questions of causation raised by her *Monell* claims are highly enmeshed with the facts of what happened on the night of the shooting. Resp. to Mot. to Bifurcate 13, ECF No. 48. She explains that her § 1983 theories implicate the City's alleged failure to implement the CIT program; the alleged knowledge of the officers present that their use of force would not be seriously scrutinized; and their alleged knowledge that fellow officers would not report their conduct. *Id.* Each of those issues requires exploring, at a minimum, what individual officers had known about the CIT program and previous use-of-force incidents. A § 1983 plaintiff who sues a municipality based on its employee's conduct usually must show that the employee violated the constitution. *See Los Angeles v. Heller*, 475 U.S. 796, 799 (1986). But in some circumstances, "a municipality can be held liable under *Monell*, even when its officers are not, unless such a finding would create an inconsistent verdict." *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 305 (7th Cir. 2010) (citing *Heller*, 475 U.S. at 798–99, 801 (last cited page from opinion of Stevens, J.)) (emphasis omitted); *accord Swanigan I*, 775 F.3d at 962 (citing *Thomas*, 604 F.3d at 305) (adding that seeking injunctive or other equitable relief may justify awarding relief on *Monell* theory even though employees are not liable under § 1983); *see also Swanigan II*, 881 F.3d at 583–84 (analyzing, and rejecting, damages claim against the City for policy of placing detainees in lineups, even though jury had awarded plaintiff $60,000 from the individual officers for unlawfully detaining him); *Colbert v. City of Chicago*, 851 F.3d 649, 655–56 (7th Cir. 2017) (separately examining § 1983 malicious–prosecution claim and "direct claim" against City alleging that unconstitutional ordinance was the moving force behind the prosecution). Without a verdict for or against individual officers in the first phase, there is nothing with which a verdict on Bonds' *Monell* claims can conflict. *See Thomas*, 604 F.3d at 305.

In the absence of any contrary authority cited by the City (which bears the burden of persuasion, *see Trading Techs. Int'l v. eSpeed, Inc.*, 431 F. Supp. 2d 834, 837 (N.D. Ill. 2006) (citing *Real v. Bunn–O–Matic Corp.*, 195 F.R.D. 618, 620 (N.D. Ill. 2000)), the court is not sufficiently persuaded that the proposed bifurcation has a good chance of avoiding *Monell* discovery or simplifying the issues. Bifurcation instead seems likely to delay the inevitable, because, in short, Bonds' *Monell* claims embrace theories that what the officers on the scene knew about the CIT program and the other alleged policies and customs is deeply enmeshed with the objective inquiry under the Fourth Amendment. *See Swanigan II*, 881 F.3d at 580 (adjudicating *Monell* claims even after staying *Monell* issues for years and trying claims against individual officers to a verdict). This makes the parties' debates over the likely burden of *Monell* discovery and motion practice under the proposal somewhat secondary. *See Taylor v. Kachiroubas*, No. 12 C 8321, No. 12 C 8349, 2013 WL 6050492, at *4 (N.D. Ill. Nov. 15, 2013) ("More important [than how burdensome *Monell* discovery will be] is the question of whether these burdens are likely to be avoided by proceeding initially on the claims against the individual defendants.").

The City's concerns about the likely cost and expense of *Monell* discovery appear to be somewhat overblown, and unitary discovery appears manageable. Citing Bonds' first request for production of documents, ECF No. 47 Ex. A, the City complains that Bonds seeks: (1) virtually all documents pertinent to Chicago's CIT program from 2002–14; and (2) documents produced to the Department of Justice in a recent investigation. ECF No. 47 at 4–5. The City says that it will need to review thousands of documents, page-by-page, to determine what must be redacted when responding to the second request. *Id.* As Bonds points out, and the City does not dispute, the City produced the same papers with redaction recently in other litigation, so it needs only to

produce the same documents again here. *See* ECF No. 48-1 Ex. A, B (orders requiring production in *Williamson v. City of Chicago*, No. 14-CV-6397 (N.D. Ill. Feb. 10 & May 22, 2017)). The sheer scope of the CIT request is broad, and the court understands the City's concerns about the potential burden on policymaking officials with the City. If this discovery turns out to be vexatious or unduly burdensome, the court can, and will, curtail it. *See* Fed. R. Civ. P. 26(b)(1), (c)(1) (permitting issuance of discovery order protecting party "from annoyance, embarrassment, oppression, or undue burden or expense"). That said, if bifurcation will only delay inevitable discovery disputes, it has little utility. *Taylor*, 2013 WL 6050492, at *4.

The City also makes a remarkable offer in its motion to bifurcate. If the motion is granted, the City offers to "forego filing any dispositive motion until a jury" has decided the factual question presented in the proposed first phase (though it reserves the right to move for summary judgment based on the timeliness of this suit). ECF No. 47 at 6 & n.7. Again, if, as presently appears, bifurcation is substantially likely to delay inevitable *Monell* discovery, the City's proposal would realize no economy. The court would like to hear from the parties, however, on whether the timeliness issue could be explored at an early phase of discovery.

The City makes a proposal for disentangling discovery in the two phases that inadvertently demonstrates how difficult separating them would be. Pointing out that the City has disclosed over 100 witnesses with knowledge of the facts of the shooting, Bonds argues that she would be put to the expense of deposing many of them in both phases. ECF No. 48 at 4–5. The City responds by proposing an exception to the phases: let Bonds pose *Monell*-related questions to those witnesses. Reply 4–5, ECF No. 51. Without documentary discovery and one or more Rule 30(b)(6) depositions on *Monell* issues, Bonds' counsel would be at a serious disadvantage when questioning City personnel about matters relevant to her *Monell* claims. The

9

City suggests no way of preventing *Monell* issues from bleeding completely into the first phase under its scheme. And lastly, but by no means least, the sheer number of witnesses involved counsels against bifurcation because "[d]iscovery in this case will be substantial with or without discovery into the *Monell* claim." *Cadiz v. Kruger*, No. 06 C 5463, 2007 WL 4293976, at *5 (N.D. Ill. Nov. 29, 2007).

Finally, the City argues that bifurcation will "avoid[ ] prejudicing the jury against the officers involved in [the] incident." ECF No. 47 at 8. This argument, as the court understands it, concerns the potential prejudice from the presentation of *Monell* issues, which evidence may include other use-of-force incidents and alleged misconduct, at a consolidated trial. But again, no individual officers will be defendants in any trial here, with or without bifurcation.

Furthermore, the better time to evaluate the prejudice issue is shortly before trial, when the court (and the parties) will have a much better understanding of the evidence and its relevance. At that point, the court will be in a much better position than it is now to hear the parties on the subject of whether curative instructions to deal with any prejudice are likely to be effective. *See Houskins*, 549 F.3d at 496 (affirming decision not to bifurcate in part because district court gave curative instructions at trial); *Cadiz*, 2007 WL 4293976, at *6 ("Generally, the issue of avoiding prejudice at trial is better addressed by application of the Rules of Evidence, rulings in limine, and limiting instructions." (quoting *Elrod v. City of Chicago*, Nos. 06 C 2505, 07 C 203, 2007 WL 3241352, at *7 (N.D. Ill. Nov. 1, 2007))). And if at that point bifurcation looks appropriate, it may be possible to try both parts of the case to one jury and thereby avoid the significant duplication of evidence that two widely separated trials before different juries would cause.

## IV. CONCLUSION

While bifurcation is appropriate in many § 1983 cases, this one is exceptional. There are no individual officers to prejudice with a joint trial or overwhelm with tangential discovery. For the reasons stated, the City has not persuaded the court that the efficiency of a consolidated trial outweighs the potential prejudice to the litigants. *See Houskins*, 549 F.3d at 495. The City's motion to bifurcate, ECF No. 47, is therefore denied.

A status conference is set for March 23, 2018, at 9:30 a.m. At that hearing, the parties should be prepared to discuss the possibility of expediting discovery on the limitations issue.

Dated: March 14, 2018                         /s/
                                              Joan B. Gottschall
                                              United States District Judge