IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Lenora Bonds, individually and | ) | |
| As Independent Administrator of the | ) | Case No. 16 C 5112 |
| Estate of Terrance Harris, | ) | |
| | ) | Judge Gottschall |
| Plaintiff, | ) | |
| | ) | Magistrate Judge Kim |
| vs. | ) | |
| | ) | |
| City of Chicago, a municipal | ) | |
| Corporation, and Unknown Officers, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT CITY OF CHICAGO'S MOTION TO DISQUALIFY**

Defendant City of Chicago ("the City"), by and through its attorney, Mark A. Flessner, Corporation Counsel for the City of Chicago, respectfully moves the Court for an order disqualifying Jordan Marsh from representing Plaintiff in this matter and in support states as follows:

**INTRODUCTION**

From November 16, 1997 through January 16, 2016, Jordan Marsh represented the City of Chicago in complex litigation ranging from state court tort claims to federal civil rights litigation. During that timeframe Mr. Marsh defended the City against various claims of *Monell* liability that alleged the City's: failure to train, supervise, discipline, and investigate; policies of covering up excessive force by police officers; code of silence; failure to properly watch over people in police custody; policy of obtaining deficient search warrants; and most relevant to this case, failure to have policies and procedures in place to respond to citizens experiencing a mental health crisis. Mr. Marsh also personally represented numerous police officers in federal civil rights cases where the City of Chicago was a co-defendant based on similar *Monell* theories.

1

On October 25, 2019, Mr. Marsh filed his appearance on Plaintiff's behalf in this litigation alleging the very *Monell* liability theories on which Mr. Marsh has repeatedly represented the City in the past. *See* ECF No. 91; No. 36 at Count I. Yet Mr. Marsh's previous defense of the City (his client at the time) necessarily provided Mr. Marsh with confidential and privileged client information that is highly related to the claims in this litigation.

Mr. Marsh's representation of Plaintiff in this litigation is a clear violation of the rules of professional conduct. "[T]he duty of confidentiality represented in the Rules of Professional Conduct … is fundamental to the profession and the relationship between lawyer and client." *Watkins v. Trans Union, LLC*, 869 F.3d 514, 519 (7th Cir. 2017). To avoid ethical violations and gross unfairness to the City and its agents and to maintain the integrity of the legal system, the Court should disqualify Mr. Marsh and his firm in this case.

**FACTUAL BACKGROUND**

Mr. Marsh was hired as an Assistant Corporation Counsel in the Torts Division of the City of Chicago Department of Law beginning November 16, 1997. Declaration of Sheila Pierre at ¶ 4, attached hereto as Exhibit A. By January 1, 2007, Mr. Marsh was assigned to the Special Litigation Unit ("SLU") as a Special Litigation Counsel. *Id.* at ¶ 6. SLU consisted of a group of attorneys for the City that handled complex litigation cases, including federal civil rights and *Monell* related cases pursuant to 42 U.S.C. § 1983. *See* Declaration of Caroline Fronczak at ¶ 6, attached hereto as Exhibit B; *see also Monell v. Dep't of Soc. Servs. Of City of New York*, 436 U.S. 658 (1978) (providing the basis for *Monell* theory liability). In October of 2011, SLU was re-constituted as the Federal Civil Rights Litigation Division ("FCRL"), focusing specifically on federal civil rights litigation as it related to representation of the City and Chicago Police officers (among others) in civil rights lawsuits, including under *Monell* theories of entity liability. Exhibit

B at ¶¶ 3-6. Mr. Marsh joined FCRL on October 1, 2011 as an Assistant Corporation Counsel Supervisor/Senior, representing both the City and Chicago Police officers in civil rights lawsuits. Exhibit A at ¶ 7; Exhibit B at ¶¶ 7-10.

The cases that Mr. Marsh worked on involved allegations of misconduct by Chicago Police officers and allegations against the City for municipal liability pursuant to *Monell*. They included allegations that the City purportedly and deliberately practiced widespread customs of: failure to train, failure to supervise, failure to discipline, failure to investigate, covering up excessive force by police officers, code of silence, failure to properly watch over people in police custody, obtaining deficient search warrants, and failure to have policies and procedures in place to respond to citizens experiencing a mental health crisis. Exhibit B at ¶ 5. *See* Attorney Appearances for Jordan Marsh, attached hereto as Exhibit C; *see also* Complaints with *Monell* Allegations, attached hereto as Exhibit D at 6-7, 17-18, 28-37, 60-62, 77-81, 93-94, 108-110, 121-122, 139-141, 151-153, 163-164, 166-168, 189-190, 200-201, 215-217; *see also* Pleadings and Documents from *Paine*, attached hereto as Exhibit E at 10-11, 104-106.

Mr. Marsh defended the City in at least six cases involving *Monell* claims and defended Chicago Police officers in at least ten cases where the City was a co-defendant with allegations involving such claims. Exhibit C; Exhibit D at 6-7, 17-18, 28-37, 60-62, 77-81, 93-94, 108-110, 121-122, 139-141, 151-153, 163-164, 166-168, 189-190, 200-201, 215-217; Exhibit E at 1, 10-11, 104-106. Mr. Marsh is extremely familiar with these types of cases and claims and how the City investigates and defends them. As a supervising attorney in FCRL, Mr. Marsh's responsibilities included, but were not limited to, the following: supervising and reviewing the work of staff attorneys; providing assistance in developing case strategies; conducting strategy meetings; supervising discovery and coordinating with department investigators and law

3

enforcement agencies responsible for gathering case evidence; preparing and defending, pursuant to Fed. R. Civ. P. 30(b)(6), corporate representatives of the City and CPD who would testify regarding the City's policies, procedures, and training; serving as lead attorney at trials or legal proceedings; compiling activity reports of staff attorneys; preparing summaries; and seeking settlement approval. Exhibit A at ¶ 8; Exhibit B at ¶ 8. In order to perform these duties and defend the litigation, the City gave Mr. Marsh direct access to confidential and privileged information regarding *Monell* claims and defenses. The confidential and privileged information included, but was not limited to, the following: case evaluation and litigation strategies, settlement evaluation and strategies, confidential and privileged analysis and communications about the merits of different litigation strategies and approaches to *Monell* litigation, internal affairs documents, privileged communications from defendant officers regarding *Monell* allegations while in the presence of their counsel under the joint defense privilege, training materials, non-public Chicago Police Department documents, and contact with non-party Chicago Police Department personnel. Exhibit B at ¶¶ 11-18.

As just one example, Mr. Marsh represented the City in *Paine v. City of Chicago et al.*, No. 06-cv-3173. Exhibit E at 1. *Paine* concerned a 2006 incident where a woman was arrested; allegedly had a psychiatric episode and was acting erratically and abnormally while in CPD custody; was subsequently released near the area of the Robert Taylor Homes; and after her release from CPD custody was abducted, sexually assaulted, and "propelled out of a seventh floor apartment window," sustaining serious injuries. Exhibit E at 120-125. Count II of the Complaint and Count XXXVIII of the Third Amended Complaint alleged municipal liability against the City for failing to train officers in how to identify and respond to people experiencing signs of mental illness, failure to implement existing policy regarding situations where detainees

show signs of mental illness, failure to ensure officers with specialized training to respond to mental illness issues are available on every shift, creating an environment in which Chicago Police officers are encouraged to ignore signs of mental illness, and failure to enforce existing CPD policy regarding encounters with people with mental illness. Exhibit E at 10-11, 104-106.

As part of the defense in the litigation, interviews and disclosures were made of three witnesses with knowledge about the Crisis Intervention Team ("CIT"). *See* Exhibit E at 128-129. Part of the purpose of a CIT program is to train police officers to respond to citizens having a mental health crisis. *See* City of Chicago's Answer to Plaintiff's First Amended Complaint, Affirmative Defenses and Jury Demand, ECF No. 36, attached hereto as Exhibit F at ¶ 48. CPD's CIT program began in 2004 and became an official component of the CAPS Project Office in 2010. *Id.* at ¶ 50. However, even though *Paine* concerned a 2006 incident, litigation in the case did not finish until February 7, 2013, when the case settled for $22,500,000.00. *See* Order Approving Settlement, attached hereto as Exhibit E at 143-145.

In this case, Mr. Marsh is seeking to litigate very similar *Monell* allegations *against* the City. In so doing, he has an unfair and impermissible roadmap from what he learned, from his former client, when he defended against the allegations he is now making. In this case, Plaintiff alleges municipal liability against the City based on allegations of an unconstitutional police-involved shooting incident that occurred on October 23, 2013. Exhibit F at ¶¶ 9-43. Specifically, Plaintiff alleges the City failed to have adequate policies in place regarding the interactions between CPD officers and people with mental illness, failed to adequately implement its CIT program, failed to investigate, supervise, and discipline CPD officers, and that a code of silence existed within CPD. *Id.* at ¶¶ 45-46, 70, 86. The complaint sets forth the history and implementation of the City's CIT program from 2004 through 2014. *Id.* at ¶¶ 47-63. These very

claims and relevant discoverable time period in this case encompass the same time period and subject matter. *See generally* Exhibit E.

Mr. Marsh's representation of Plaintiff in this litigation violates three sections of the Model Rule of Professional Conduct 1.11. First, Plaintiff's claims in this case are based on an alleged failure to implement policies regarding mental illness and the CIT program, failure to investigate, supervise, and discipline, and the existence of the code of silence. *Id.* at ¶¶ 45-46, 70, 86. All of these allegations rely on the same subject matter and allegedly took place during the same time period in other cases. Accordingly, Mr. Marsh is ethically prohibited from continuing to represent Plaintiff under Rule 1.11(a)(2). Second, because of the confidential information Mr. Marsh learned during his representation of the City, Mr. Marsh is ethically prohibited from representing Plaintiff under Rule 1.9(c) as applied through Rule 1.11(a)(1). Finally, Mr. Marsh's decision to represent Plaintiff in this matter knowing that the City's confidential information would improperly benefit Plaintiff's municipal liability claim is a violation of Rule 1.11(c).

Mr. Marsh's continued representation of Plaintiff is unethical, as well as unfair to his former client, the City, and erodes the integrity of the legal system. Mr. Marsh, by definition, has an insider's knowledge of the City's confidential and privileged information, which will be used to the City's detriment if he is allowed to continue representing Plaintiff. Because Mr. Marsh is ethically prohibited from representing Plaintiff in this matter, the Court should disqualify him. Because we have no assurances that Mr. Marsh's firm has not be tainted by Mr. Marsh's knowledge of the City's confidential and privileged information, his firm must also be disqualified.

## ARGUMENT

I.     **LEGAL STANDARD**

"A motion to disqualify counsel requires a two-step analysis where the Court (1) considers whether there is an ethical violation and then, if so, (2) determines whether disqualification is appropriate to remedy the violation." *Vill. of Tinley Park, Ill. v. Connolly*, No. 17 C 3271, 2018 WL 1054168, at *2 (N.D. Ill. Feb. 15, 2018). When evaluating whether an ethical violation has occurred, courts in the Northern District of Illinois apply the Model Rules of Professional Conduct adopted by the American Bar Association (the "Rules"). Local Rule 83.50. Rule 1.11 governs "Special Conflicts of Interest for Former and Current Government Officers and Employees" and is applicable here.[1] *See United States v. Smith*, 995 F.2d 662, 675 (7th Cir. 1993) (affirming the application of the nearly identical Illinois Rule of Professional Conduct 1.11 to disqualify a lawyer formerly employed by the United States Attorney's Office).

**II.     Mr. Marsh's Representation of Plaintiff is an Ethical Violation of Three Separate Sections of Rule 1.11.**

---

[1] Historically, courts in this Circuit have routinely disqualified former government lawyers from representing clients regarding issues in which the lawyer had substantially participated during his or her government employment. *See, e.g.*, *LaSalle Nat. Bank v. Lake Cty.*, 703 F.2d 252, 256 (7th Cir. 1983) (disqualifying an attorney who, as an Assistant State's Attorney, "was clearly privy to a substantial amount of discussion and strategic thinking about the various sewage agreements negotiated and signed by Lake County with various municipalities over a period of time when the validity of such agreements was being challenged," from later representing a client suing Lake County for access to the County's sewer system); *Dugar v. Bd. of Educ. of City of Chicago, Dist. 299,* No. 92 C 1621, 1992 WL 142302, at *4 (N.D. Ill. June 18, 1992) (disqualifying an attorney who, as an Assistant Attorney in the Board's Law Department, "was privy to the discussions regarding the Board's position—and presumably the positions taken by various schools—regarding the appropriate level of procedural protection to be afforded students during expulsion hearings," from later representing a client suing the Board alleging systematic due process violations pertaining to expulsions"). Courts examined the relationship between the lawyer's previous employment and his current client's claims by applying a "substantial relationship test" as announced in *LaSalle*. A recent Seventh Circuit case, however, has called into question the continuing applicability of the substantial relationship test in light of the existence of specific rules of professional conduct. *See Watkins*, 869 F.3d at 523–25 (stating that the substantial relationship test no longer governed Indiana attorneys because it was based on now-disregarded Canons of the ABA Code and announced before Indiana adopted the Model Rules). Regardless of the current validity of the substantial relationship test, the fundamental principle is the same: an attorney should not gain an unfair litigation advantage on account of his access to confidential information acquired during government service.

When an attorney's "successive clients are a government agency and another client, . . . unfair advantage could accrue to the other client by reason of access to confidential government information about the client's adversary obtainable only through the lawyer's government service." Cmt. 4. "In interpreting the Rules of Professional Conduct, federal courts may rely on the specific guidance offered in the commentary." *Watkins v. Trans Union, LLC*, 869 F.3d 514, 519 (7th Cir. 2017). Mr. Marsh's representation of Plaintiff is exactly the situation the commentary was referring to and the Court should disqualify Mr. Marsh pursuant to Rule 1.11.

### A. Mr. Marsh's Representation is a Violation of Rule 1.11(a)(2) Because it is in the Same Matter as to which Mr. Marsh Defended the City while Working in the Department of Law.

The rules prevent a former lawyer for the government from "represent[ing] a client in connection with a matter in which the lawyer participated personally and substantially as a public officer or employee, unless the appropriate government agency gives its informed consent, confirmed in writing, to the representation." Rule 1.11(a)(2). "Matter" is defined broadly and includes any "judicial or other proceeding . . . claim, controversy, . . . accusation . . . or other particular matter involving a specific party or parties." Rule 1.11(e)(1). Importantly, a "matter" is not limited to a single, discrete incident in time. Rather, "a 'matter' may continue in another form. In determining whether two particular matters are the same, the [Court] should consider the extent to which the matters involve the same basic facts, the same or related parties, and the time elapsed." Cmt. 10. Additionally, subsection (a)(2) does not require a lawyer to have represented the government in a matter; rather, it requires only that the lawyer have participated in the matter.

Model Rule 1.11(a)(2) is designed to "prevent a lawyer from exploiting public office for the advantage of another client." Cmt. 3. That is exactly what is happening here and it should not

8

be allowed. In a similar case a plaintiff's attorney and firm, Henderson Parks (the same firm that represents Plaintiff in this matter), were recently disqualified because the attorney previously represented the City in *Monell* litigation and, after leaving the Department of Law, filed a new lawsuit alleging *Monell* liability under the same theories. *See Kiontae Mack v. City of Chicago et al.,* No. 19-cv-04001, ECF No. 31-32, 41, 44, 49 (providing the complete briefing on the motion to disqualify and the Court's ruling).

Mr. Marsh's representation in this case exploits his former public position for his new client's advantage in exactly the same way. Mr. Marsh spent at least seven years defending the City in *Monell* liability cases, personally and substantially participating in seventeen claims, that were primarily concerned with the same time period at issue in this case. As just one example, Plaintiff's allegations against the City in this litigation are the same allegations on which Mr. Marsh defended the City in *Paine*. These claims are the same matter as considered by Rule 1.11(a)(2) and therefore Mr. Marsh should be disqualified.

1. **Plaintiff's Case and Mr. Marsh's Previous Cases Involve the Same Basic Facts.**

Municipal liability can exist under § 1983 if a constitutional violation by the municipality's employee was the result of a "government 'custom' even though such a custom has not received formal approval through the [municipality's] official decisionmaking channels." *Monell*, 436 U.S. at 691. Mr. Marsh represented the City or Chicago Police Officers in fifteen previous lawsuits that allege *Monell* liability that are the same as some or all of Plaintiff's allegations in this case. Exhibit D at 6-7, 17-18, 28-37, 60-62, 77-81, 93-94, 108-110, 121-122, 139-141, 151-153, 163-164, 166-168, 189-190, 200-201, 215-217; Exhibit E at 10-11, 104-106. Mr. Marsh personally participated in those cases, both as an assistant corporation counsel and as a supervisor. Mr. Marsh was directly involved with, if not actually in charge of, case evaluation,

9

litigation strategy, interviewing agents of the City, conducting discovery, and evaluating settlement. Mr. Marsh investigated the *Monell* allegations and defended the City against them.

Furthermore, Plaintiff's allegations in this claim are the same as the allegations on which Mr. Marsh represented the other side in his previous cases. Most importantly, Plaintiff's claims are the same as the allegations in *Paine* as they both allege municipal liability for the failure to have policies in place to deal with mental health issues and failure to adhere to the policies already in place.

The basic facts of these cases revolve around whether or not the alleged failures actually existed, whether or not the City was on notice of them, and whether or not the City did anything to fix the alleged issues. All of Plaintiff's claims, the alleged failure to implement policies regarding mental illness and the CIT program, failure to investigate, supervise, and discipline, and the existence of the code of silence, are the same factual allegations Mr. Marsh previously defended against for the City. In this case, Plaintiff's complaint alleges the creation, history, and inadequacy of the City's CIT program. Exhibit F at ¶¶ 47-63. This program and the alleged failures of CPD to respond to issues of mental illness are the same factual issues in *Paine*. Exhibit E at 10-11, 104-106. Therefore, Mr. Marsh investigated the issues in Plaintiff's complaint on behalf of the City in *Paine*. Furthermore, Plaintiff alleges liability based on the City's failure to investigate, supervise, and discipline officers, as well as there being a code of silence. Exhibit F at ¶¶ 70, 86. These same allegations and factual bases are present during the same time period in other cases Mr. Marsh defended on behalf of the City. Exhibit D at 6-7, 17-18, 28-37, 60-62, 77-81, 93-94, 108-110, 121-122, 139-141, 151-153, 163-164, 166-168, 189-190, 200-201, 215-217.

The confidential and privileged information Mr. Marsh obtained for his defense of the City is now being used against his former client. Because of the abundant overlap, Plaintiff's case and Mr. Marsh's previous work involve the same basic facts.

**2. Plaintiff's Case and Mr. Marsh's Previous Cases Involve the Same Party.**

Mr. Marsh participated in fifteen cases where he was either personally or substantially involved in *Monell* litigation. Exhibit C; Exhibit D; Exhibit E. These lawsuits contain the same or substantially similar allegations as Plaintiff's lawsuit. The City was a party to all fifteen cases and is the only defendant in this lawsuit. Exhibit D; Exhibit E; Exhibit F.

**3. The Relevant Time Period of Plaintiff's Claims is the Same Time Period As the Claims on which Mr. Marsh Defended the City.**

Mr. Marsh worked for the Department of Law from 1997 until January 16, 2016. Plaintiff's allegations concern 2004 through 2016. Exhibit F at ¶¶ 45-93. Specifically, Plaintiff's allegations regarding the CIT program revolve around its inception in 2004 through the date of the incident, October 23, 2013. Exhibit F ¶¶ 45-69. This is the same time period Mr. Marsh was investigating and litigating claims regarding the City's failure to handle mental health issues stemming from a 2006 incident until the case settled in February of 2013. Exhibit E at 1, 2-17, 143-145. And the Monell allegations in this case and the other cases cover substantially the same time periods. *See generally* Exhibit E. Furthermore, Mr. Marsh did not ask the City for, nor has the City given its written consent to his representation of Plaintiff in this case. Therefore, for the reasons stated above, Mr. Marsh should be disqualified.

**B. Mr. Marsh's Representation is A Violation of Rule 1.9(c) as Made Applicable Through Rule 1.11(a)(1).**

Rule 1.11(a)(1) subjects former government attorneys to Rule 1.9(c). Under Rule 1.9(c), "[a] lawyer who has formerly represented a client in a matter … shall not thereafter use

information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client, or when the information has become generally known." While violation of this Rule does not necessarily lead to disqualification, the ABA, in explaining the rule stated that "a former government lawyer may be barred by Rule 1.9(c) from representing a private client, against her former agency or otherwise, if she would be required to use or disclose in the private representation information relating to her representation of the government." ABA Comm. on Ethics & Prof'l Responsibility, Formal Op. 97-409 ("Conflicts of Interest: Successive Government and Private Employment").

Mr. Marsh's representation in this case creates the exact factual scenario Rule 1.11(a)(1) seeks to prevent. Mr. Marsh obtained substantial confidential and privileged information that will greatly disadvantage the City in this case. Mr. Marsh's former positions within the Department of Law allowed him to have access to, and required him to investigate, the City's confidential litigation strategies and procedures in defending *Monell* litigation. Exhibit B at ¶¶ 11-18. For example, Mr. Marsh learned how *Monell* claims are internally processed and investigated, how the City investigates its officers, and how the City was implementing the CIT program. *Id.* Furthermore, Mr. Marsh was involved with the City's internal and privileged evaluation of exposure regarding these claims. *Id.* at ¶ 16. Also, Mr. Marsh had access to confidential internal affairs documents and had the ability to request non-redacted copies of almost any document from CPD besides documents involving confidential informants. *Id.* at ¶¶ 17-18. As part of Mr. Marsh's defense of the City, Mr. Marsh was also expected to prepare and defend 30(b)(6) witnesses for the City and CPD. In cases where there were allegations of municipal liability and Mr. Marsh represented the police officers only, he was still involved with confidential and privilege information on such liability based on the joint defense privilege. *Id.* at ¶ 8.

It is not believable or possible for Mr. Marsh to ignore his confidential and privileged information in prosecuting this case. *Cf. PepsiCo, Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995) (finding, in a trade secret context, that "unless [the defendant] possessed an uncanny ability to compartmentalize information, he would necessarily be making decisions" in his new job based on trade secrets learned in his previous job). Of course, Mr. Marsh will use, and cannot help using, the information he acquired in *defending* these claims to try to plead around those defenses and conduct discovery to defeat those defenses. This is simply impermissible. *See also* ABA Formal/Op. 97-409 (stating that "if zealous and competent representation" of a new private client would require an attorney to "use or reveal nonpublic information relating to her representation of the government to the government's disadvantage," the attorney would be in violation of her confidentiality obligation to both the former government client under Rule 1.9(c) and the new private client under Rule 1.7(b).)). Therefore, Mr. Marsh's representation in this case violates Rule 1.9(c).

Because Mr. Marsh's representation violates Rule 1.9(c), he should be disqualified.

> Where a former government lawyer wishes to represent private clients against her old agency in connection with the same kind of cases she handled while in government service, Rule 1.9(c) may pose an additional obstacle to her doing so. While she is automatically barred only from those particular matters in which she personally participated, she may also be subject to disqualification under Rule 1.9(c) if in the new representation she would be required to use or reveal confidences of her former government client.

ABA Formal Op. 97-409. "[J]ust as any other organizational client, the government has a legitimate interest in ensuring that its own confidences are not used against it by lawyers who leave its employ." *Id.* Mr. Marsh's representation is the scenario discussed above and therefore, Mr. Marsh should be disqualified.

13

### C. Mr. Marsh's Representation Violates 1.11(c) because Mr. Marsh has Confidential Government Information About the City that Could Be Used to the City's Material Disadvantage.

Rule 1.11(c) provides:

> a lawyer having information that the lawyer knows is confidential government information about a person acquired when the lawyer was a public officer or employee, may not represent a private client whose interests are adverse to that person in a matter in which the information could be used to the material disadvantage of that person. As used in this Rule, the term "confidential government information" means information that has been obtained under governmental authority and which, at the time this Rule is applied, the government is prohibited by law from disclosing to the public or has a legal privilege not to disclose and which is not otherwise available to the public.

Mr. Marsh acquired confidential and privileged information about the City while working in the Department of Law. This information is "confidential government information" for the purposes of Rule 1.11(c) because the City has a legal privilege not to disclose it. For example, as a supervisor, Mr. Marsh was privy to internal policies created for the purposes of defending against *Monell* allegations concerning a code of silence, failure to train, failure to supervise, and failure to discipline. Exhibit B at ¶¶ 11-14. Mr. Marsh also had direct access to the CIT program documents and personnel as it was being implemented between 2006 and 2013. Exhibit F at ¶¶ 17-18.

Mr. Marsh knew, or should have known that he would use this information to make the strongest presentation *against his former client* when he filed an appearance for Plaintiff in this lawsuit. Mr. Marsh's representation is a violation of Rule 1.11(c) and he should therefore be disqualified.

### III. The Only Adequate Remedy is Disqualification.

Disqualification is the only way to, "ensure not only the reality but the appearance of propriety, maintenance of the public trust, and safeguard the privacy of the attorney-client relationship." *Medgyesy v. Medgyesy*, 988 F. Supp. 2d 843, 849–50 (N.D. Ill. 2013). Mr. Marsh spent thirteen years working for the City's Department of Law. Nine of those years included defending the City in litigation that included allegations of municipal liability. Mr. Marsh specifically defended the City against the same claims brought by Plaintiff in this litigation. Mr. Marsh was given confidential and privileged information in order to defend the City. It is not feasible for Mr. Marsh to parse out the confidential and privileged information he obtained. He will necessarily use that information to the City's detriment.

Even if there was some way for Mr. Marsh to compartmentalize his knowledge and prevent disclosing confidential and privileged information to Plaintiff (there is not), doing so would violate Mr. Marsh's obligations under Rules 1.9(c) and 1.7 (b). *See also Doe v. Nielsen*, 883 F.3d 716, 719 (7th Cir. 2018) ("[A] conflict of interest arises when an attorney has an incentive to reject lines of inquiry or argument that might help his client's case."). Therefore Mr. Marsh should be disqualified.

**IV.      Remaining Plaintiff's Counsel May Need to Be Disqualified.**

There is an additional injury to the City that merely disqualifying Mr. Marsh will not correct. If Mr. Marsh shared the above-described confidential and privileged information with co-counsel in this matter, then Mr. Marsh's disqualification alone does not eliminate all of the harm this motion seeks to prevent. The fact that Mr. Marsh entered an appearance joining Henderson Parks in representing Plaintiff against the City in this case is proof that both *are* sharing information and strategies in the case, which would necessarily include the *Monell* allegations. Unless sufficient proof is provided showing that such taint has not and cannot occur,

15

the firm should be disqualified as well. This was the result in *Kiontae Mack v. City of Chicago et al.,* No. 19-cv-04001, ECF No. at 47.

## CONCLUSION

Based on the foregoing, the City respectfully asks this Court to disqualify Mr. Marsh from representing Plaintiff in this matter, require Mr. Marsh provide an affidavit regarding any information already disclosed to Plaintiff and co-counsel, and provide any other relief this Court deems just and proper.

Dated: December 27, 2019								Respectfully submitted,

									Mark A. Flessner
									Corporation Counsel of the City of Chicago

						By:	/s/ Maxwell Lisy
									Assistant Corporation Counsel


Jonathan Green, Assistant Corporation Counsel Supervisor
Bret Kabacinski, Assistant Corporation Counsel
Andrea Campbell, Assistant Corporation Counsel
City of Chicago, Department of Law
Federal Civil Rights Litigation Division
30 N. LaSalle Street, Suite 900
Chicago, Illinois 60602
312-742-1842 (Phone)
312-744-6566 (Fax)