IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LENORA BONDS, as Independent Administrator of the Estate of TERRANCE HARRIS, | )<br>)<br>) Case No. 16-cv-5112 |
| Plaintiff, | ) Judge Joan B. Gottschall |
| v. | ) |
| CITY OF CHICAGO | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

The City of Chicago ("City") has moved to disqualify attorney Jordan Marsh ("Marsh"), who filed an appearance as one of plaintiff's attorneys in the case at bar on October 25, 2019. Also before the court is the City's motion to strike one of the declarations attached to the motion to disqualify for lack of personal knowledge.

**I.    Defendant City of Chicago's Motion to Disqualify**

The City argues that because Marsh worked for the City's Corporation Counsel's office from November 16, 1997, through January 16, 2016, representing the City in complex litigation ranging from state court tort claims to federal civil rights litigation including *Monell*[1] claims, as well as representing numerous police officers in federal civil rights cases, Marsh is ethically prohibited from representing the City's adversary, Ms. Bonds, in this case. Mot. to Disqualify 1-2, ECF No. 100. The City points to the allegations in the case at bar, including allegations that the City failed to train, supervise, discipline and investigate its officers; covered up police officers' excessive force; permitted its officers to observe a "code of silence," meaning that

---

[1] *Monell v. Dept. of Soc. Servs. of City of New York*, 436 U.S. 658 (1978)

1

officers covered up one another's misconduct; had a policy of obtaining deficient search warrants; and failed to have policies and procedures in place to respond properly to citizens experiencing mental health crises. *Id*. at 3. It argues that Marsh was for years involved in defending the City against such claims. *Id*. at 4–6. The City further contends that plaintiff's other attorney, Henderson Parks, should also be disqualified, absent "sufficient proof" that Marsh did not share confidential and privileged information with Parks. *Id*. at 15–16. For the reasons set forth below, the City's Motion [100] is denied.

The City bears the burden of showing *facts* necessitating disqualification. *Guillen v. City of Chicago*, 956 F.Supp. 1416, 1421 (N.D. Ill. 1997). "[D]isqualification is 'a drastic measure which courts should hesitate to impose except when absolutely necessary.'" *Id. (*quoting *Owen v. Wangerin*, 985 F.2d 312, 317 (7th Cir. 1993)). The court must first determine if there is an ethical violation, and if so, whether disqualification is an appropriate remedy. *Vill. of Tinley Park v. Connolly*, 2018 WL 1054168, at *2 (N.D. Ill. Feb. 15, 2018). There must be solid evidence to support the allegation of a conflict. *Id.* (citing *Fematt v. Finnigan*, 2012 WL 3308759, at *2 (N.D. Ill. Aug. 13, 2012)); *see generally Philips Med. Sys. Int'l B.V. v. Bruetman*, 8 F.3d 600, 606 (7th Cir. 1993).

**II.    Applicable Rules**

With exceptions not applicable here, this court has adopted as the rules governing matters of attorney ethics the Model Rules of Professional Conduct of the American Bar Association ("Rules," cited as "Rule"). N.D. Ill. L.R. 83.50. Two rules are pertinent here. First, Model Rule 1.9 provides that a lawyer who formerly represented a client in a matter shall not thereafter "represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interest of the former client unless the former client gives

2

informed consent, confirmed in writing." Rule 1.9(a). The City argues, without dispute, that Marsh's current representation of plaintiff Bonds is materially adverse to the City's interests, and the City has not consented to Marsh's representation of plaintiff Bonds. Mot. to Disqualify 8–9.

The commentary to Rule 1.9, which is considered to be interpretive guidance in construing the rules, explains that two matters are "substantially related" when they involve the same transaction or legal dispute or where there is a "substantial risk that confidential factual information as would normally have been obtained in a prior representation would materially advance the client's position in the subsequent matter." Rule 1.9, cmt. 3; *see also Watkins v. Trans Union, LLC*, 869 F.3d 514, 519 (7th Cir. 2017) ("In interpreting the Rules of Professional Conduct, federal courts may rely on the specific guidance offered in the commentary"). If the information at issue was publicly disclosed or rendered obsolete by the passage of time, it will ordinarily not be disqualifying. The instant case was not filed until May 10, 2016, after Marsh left the City, and there is no suggestion that as a City employee, Marsh worked on the transaction or legal dispute involving Bonds or her deceased son, Terrance Harris. Thus, the City must establish that Marsh obtained confidential information while working for the City that would materially advance Bonds's position in the case at bar *and* that any such confidential information was not publicly disclosed or rendered obsolete by the passage of time. The commentary to Rule 1.9 also makes clear that "a lawyer who recurrently handled a type of problem for a former client is not precluded from later representing another client in a *factually distinct problem of that type* even though the subsequent representation involves a position adverse to the prior client." *Id*. cmt. 2 (Emphasis added). Further, "general knowledge of the [former] client's policies and practices ordinarily will not preclude a subsequent representation." *Id*. cmt. 3; *see* also *Watkins,* 869 F.3d at 520.

*Watkins's* analysis makes clear that covering the same subject matter for a subsequent client is not, in the absence of "a substantial risk that confidential *factual* information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter," a basis for disqualification. *Watkins*, 869 F.3d at 522 (citing Rule 1.9, cmt. 3) (emphasis added).[2] In *Watkins*, lawyer John Cento appeared for the plaintiff in a Fair Credit Reporting Act ("FCRA"), 15 U.S.C. § 1681 *et seq.*, case against a credit reporting agency, Trans Union. 869 F.3d at 516. Cento had previously worked for Trans Union, beginning in 2001. *Id.* From 2003 to 2005, Cento worked almost exclusively on FCRA cases on behalf of Trans Union as its outside legal counsel. *Id.* at 517. Cento formed his own law firm in 2013, representing consumers in FCRA cases and explicitly advertising Cento's prior experience representing consumer reporting agencies. *Id.* In 2014, Cento filed the *Watkins* case, representing Richard Watkins in an FCRA case against Trans Union, involving events that took place in 2009, four years after Cento ceased working on such cases for Trans Union. *Id.* Although Cento had not worked as a lawyer for Trans Union since 2005, some of the Trans Union employees with whom Cento worked while a lawyer for Trans Union remained with the company at the time Cento filed *Watkins*. *Id.*

The Seventh Circuit, affirming the district court under an abuse of discretion standard, refused to disqualify Cento. *Watkins*, 869 F.3d at 525. The court of appeals reasoned that the *Watkins* case was not the same transaction or legal dispute in which Cento had represented Trans Union, since that inquiry is dependent on the *facts* of a particular situation or transaction, not on whether the legal issues are the same. *Id.* at 520. The court contrasted *XYZ, D.O. v. Sykes*, 20 N.E.3d 582 (Ind. App. 2014), in which an attorney who had previously represented a doctor in

---

[2] *Watkins* was decided applying the comparable Indiana Rules of Professional Conduct, mirroring the A.B.A. Model Rules. 869 F.3d at 519.

six malpractice cases sought to represent a plaintiff in a malpractice case against the same doctor and the hospital for which the doctor worked, claiming against the hospital that it had been negligent in issuing credentials to the doctor, *based on the surgeries concerning which the lawyer had previously represented the doctor. Id* at 521 (citing *Sykes*, 20 N.E.3d at 583–84). Since the new complaint was based in part on the hospital's alleged failure to investigate the specific malpractice cases in which the lawyer had previously represented the doctor, the prior six cases and the current case were factually related, and the facts of the prior cases were relevant to the negligent credentialing allegations of the current suit. Watkins's case, by contrast, did not refer to or relate to the specific facts of any prior matter in which Cento represented Trans Union. Thus, unlike *Sykes*, *Watkins* did not involve the same transaction or legal dispute in which Cento had represented Trans Union.

The Seventh Circuit further pointed out that Cento's general knowledge and experience concerning Trans Union, which obviously would be helpful to him in representing plaintiffs (and which he advertised) was not the same as possessing confidential information. "[I]n cases involving an organizational client like Trans Union, 'general knowledge of the client's policies and practices ordinarily will not preclude a subsequent representation.'" *Watkins*, 869 F.3d at 522 (citing Rule 1.9, cmt. 3). And although Cento undoubtedly learned *some* truly confidential information while working for Trans Union, the passage of time removed any substantial risk that such confidential information would advance Watkins's case.

Model Rule 1.11 also bears on this dispute. Model Rule 1.11 addresses the special situation of lawyers who have formerly served as employees of the government. It makes such lawyers explicitly subject to Rule 1.9, but its commentary makes clear that in dealing with such lawyers, a balancing of interests is necessary so as not to "be so restrictive as to inhibit transfer

5

of employment to and from the government." Rule 1.11 cmt. 3. Thus, "a former government lawyer is disqualified only from particular matters in which the lawyer participated personally and substantially" and the disqualification does not extend "to all substantive issues on which the lawyer worked." *Id.* cmt. 4. In addressing the problems raised when former government lawyers like Marsh leave the employ of the government and use their accumulated skills and experience to represent plaintiffs suing their former employers, being too quick to order disqualification can have the deleterious effect of discouraging highly competent lawyers from spending time working for the government, where the pay is often less but the payoff is the ability to put one's experience to use for the rest of one's career working for private clients. *Id*. cmt. 3. This is *not* to suggest that the strictures of Rule 1.9 can be in any way disregarded, but it does caution the court not to be too quick to assume a conflict when one does not exist.

### III.   Discussion

The City's briefing is rich in conclusions and weak on specifics, spending a great deal of time and energy arguing that Marsh formerly worked on cases involving *subject matter* similar to that involved in Bonds's case, as well as (in comparable general terms) that he was privy to information about "the City's confidential litigation strategies and procedures in defending *Monell* litigation." (Mot. to Disqualify 12.) The court cannot expect the City to disclose the specifics of any such confidential litigation strategies or procedures, but its argument is so general and conclusory as to be essentially useless; the court has no idea to what the City is referring. As *Watkins* makes clear, general subject matter similarity is meaningless, as is general knowledge of the former's client's practices and procedures. 869 F.3d at 520. The problem with arguing about similar subject matter, besides the fact that the applicable ethical rules make it irrelevant, is aggravated by the fact that virtually *every* excessive force case this court has seen in

6

the last five or six years (or more) involves *Monell* allegations centering on the City's alleged failure to train, supervise, discipline, and investigate its officers; covering up incidents of excessive force; and permitting the existence of a code of silence. These issues are all over the news and fill the court's docket.

Besides its reliance on generalities, the City attaches to its motion a raft of complaints in cases on which Marsh worked, but it fails to make much argument except concerning one, *Paine v. City of Chicago*, No. 06-cv-3173, in which Marsh represented the City (sued under *Monell*) and which dealt, as *Bonds* does, with the specific issue (besides all the usual ones) of the appropriateness of the City's response to a citizen having a mental health crisis. 2006 WL 3065515, at *1 (N.D. Ill. Oct. 26, 2006), ECF No. 100, Ex. E. *Paine* was factually different from the case at bar (and dealt with a 2006 incident, whereas *Bonds* focuses on an incident that occurred in 2013), but the City claims that in the course of working on *Paine*, Marsh would have been exposed to confidential information, which is still relevant, about this particular subject.[3]

*Paine* involved a 2006 incident in which a woman named Christina from out of town was allegedly stranded in Chicago without the funds or mental capacity to return home. Complaint ¶ 8, ECF No. 100-5, Ex. E. She was arrested on May 7, 2006, for allegedly creating a disturbance at a Chicago Transit Authority ("CTA") train stop at Midway Airport. *Id.* ¶ 10. She behaved erratically and spoke incoherently while in custody. *Id.* ¶12. The arresting officers, in the 8th District, contacted her parents and learned of her psychiatrically-compromised condition. *Id.* ¶¶ 16–17. She was then transported, without her luggage or other belongings, to the 2nd District, more than five miles away, where there was a female holding facility. *Id.* ¶¶ 18–19.

---

[3] Since the City has not developed arguments about any cases except *Paine*, its position that other such cases have created ethical conflicts for Marsh is waived. *United States v. Beavers*, 756 F.3d 1044, 1059 (7th Cir. 2014) ("Perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived").

7

She was released the next evening at approximately 6:30 p.m.in the area of the Robert Taylor Homes, where she was abducted, sexually assaulted and thrown out a window, sustaining serious injuries. *See id*. ¶¶ 30, 34–36. Despite there being a designated mental health facility assigned to each police station and a protocol requiring that persons demonstrating symptoms of mental illness be transported to such a facility, the woman was never so transported. Moreover, her parents were not informed of her release. *Id*. ¶¶ 26–29, 32.

The case at bar similarly raises the issue of the appropriate police response to an individual having a mental health crisis and the procedures in place, or not in place, for addressing such an occurrence, but there the factual similarities diverge. In Bonds's case, the First Amended Complaint ("FAC") charges that on the evening of October 23, 2013, Harris's mother, plaintiff Bonds, called 911 during an altercation with her son. FAC ¶ 11, ECF No. 34. When police arrived, Harris had barred the door and was making nonsensical statements about a "Mason" and "Israelites." *Id*. ¶ 15. When the police forced open the door, Harris cut a Chicago police sergeant with a knife. *Id*. ¶ 17. While the officers were waiting for backup, Ms. Bonds exited the home and informed the officers that Harris was hiding in the basement and was off his medication. *Id* ¶ 21. Allegedly, the police then stormed the house, proceeded to the basement, ordered Harris to drop the knife (he refused), converged on Harris's location and shot him 29 times, killing him. *Id*. ¶¶ 27-40.

With respect to the issue of the police response to Harris's mental health crisis, the FAC contains numerous allegations concerning the City's Crisis Intervention Team ("CIT") program, alleging that the City failed to implement it properly. FAC ¶¶ 44–69. The FAC alleges that in 2005, following a number of well-publicized police shootings of persons suffering from mental illness, the City adopted a CIT program which provided, among other things, (1) a sufficient

number of CIT trained officers to handle mental health related calls, (2) tools to help 911 call takers identify calls likely to involve someone experiencing a mental health crisis, and (3) a means for dispatchers to identify and dispatch CIT trained officers to respond to such calls. *Id*. ¶¶ 47–48. The CIT program was training up to 30 officers per month in 2006. *Id*. ¶ 51. However, in 2007, following the departure of Superintendent Cline, CPD leadership and City officials failed to make the CIT program a priority; staff was cut, officer participation declined "precipitously," and support for the program dwindled. *Id*. ¶ 52–53. Funding was inadequate. *Id*. ¶ 54. An insufficient number of officers have been trained and certified for the program. *Id*. ¶ 55. As a result, only a quarter of calls that should have been assigned to CIT-trained officers were so assigned. *Id.* ¶ 56. Dispatchers fail adequately to identify calls involving mental health crises or locate properly-trained officers. *Id*. at ¶ 57. These failures have been widely recognized, including by the Police Accountability Task Force ("Task Force"), by City officials, by the U.S. Department of Justice, and in Congressional testimony by Deputy Superintendent Alfonza Wysinger in 2012. FAC, ¶¶ 59–63. The City fails to indicate how much of the history of the CIT program is public, but given this brief history of the program's recognized failures, it can be presumed that a great deal of it is not (or is no longer) confidential.

The *Paine* complaints[4] do not mention the CIT program, but the City's Motion to Disqualify reports that the CIT program came up during discovery in *Paine* (*see* Mot.to Disqualify 5), and it focuses on knowledge Marsh allegedly obtained about the CIT program during discovery. Specifically, the City states, "As part of the defense in the [*Paine*] litigation,

---

[4] The court finds no explicit reference to the CIT program in the original complaint, filed June 9, 2006, the Second Amended Complaint ("SAC"), filed November 24, 2008, or the Third Amended Complaint ("TAC"), filed December 8, 2008. The SAC and the TAC allege that the watch commander for the 8th District had authority and resources to direct the transfer of Christina to a mental health facility, Mt. Sinai Hospital, which was the designated mental health facility for the Eighth District. Further, the TAC alleges similar failures on behalf of various police personnel at the Second District.

9

interviews and disclosures were made of three witnesses with knowledge about the Crisis Intervention Team." *Id*. at 5. The City cites Exhibit E to its Motion to Disqualify at 128-29. Those pages consist of a list of names and (primarily) work addresses, all in response to an interrogatory seeking the names of individuals "likely to have discoverable information that the City may use to support its claims or defenses." Defendant's Supplemental Disclosures 124, ECF No. 100-5, Ex. E. Nothing confidential is set forth on those pages, although they do not eliminate the possibility that a City lawyer spoke to the persons named to ascertain that they had relevant information, and that some information provided was privileged.

However, these interrogatory answers are signed by Matthew Hurd, Deputy Corporation Counsel, and not by Marsh. *Id*. at 151. Mr. Hurd has filed a declaration in support of Bonds's opposition to the City's motion stating that he was the lead litigator in *Paine*, that the *Monell* allegations were bifurcated from the case in December 2006 and not subject to discovery (*Paine* was filed in June 2006, so the case was young at the time of bifurcation), and that to the best of Hurd's recollection, "Mr. Marsh was not involved in litigation or discovery regarding the plaintiff's *Monell* claims while they were active or during motion practice, nor was he involved in any work relating to the issue of mental health policies and training for the City of Chicago or its police officers." Hurd Decl. 2, ECF No. 103-4, Ex. D. Marsh similarly avers that he recalls no involvement in any *Monell*-related activity before bifurcation, and the bifurcation and eventual settlement obviated any need for litigation of or discovery related to the *Monell* claims. Marsh Decl. 2, ECF No. 103-1, Ex. A. The City challenges the relevance of Hurd's and Marsh's lack of recollection, but nothing the City argues in its Motion, and nothing provided in support, tells the court what, if anything, Marsh did in connection with *Paine* relating to the CIT program. Hurd's and Marsh's declarations stand largely unrebutted.

10

The City argues that "[h]istorically, courts in this Circuit have routinely disqualified former government lawyers from representing clients regarding issues in which the lawyer had substantially participated during his or her government employment." Mot. to Disqualify 7, n. 1. Assuming that the City means what it says—that if a government lawyer substantially participated in *an issue*, district courts in the circuit routinely (historically) disqualified him or her—its statement of the law is either obsolete or simply wrong. *Watkins*, relying on the ABA Model Rules as this court must do pursuant to its local rules, seems to say precisely the opposite, that working on related *factual matters*, not related *issues*, is what is disqualifying. *See Watkins*, *supra*, 869 F.3d at 520 (citing Rule.1.9, cmt. 2: "Whether two matters 'involve the same transaction' is determined by an inquiry into whether the matters are factually related"). The cases the City cites for this proposition applied something called the "substantial relationship" test which, according to the Seventh Circuit in *Watkins*, has been replaced by the Model Rules, which "clarified and narrowed the contours" of the substantial relationship test. *Id.* As *Watkins* makes clear, the new approach depends on whether the matters (former and current) are factually related or if not, whether "there is a substantial risk that confidential information would materially advance the client's position in the present matter." *Id*. Confidential information acquired by the lawyer in the previous representation is not problematic if it was disclosed to the public or rendered obsolete by the passage of time. Even more important to the present inquiry is that when a lawyer formerly represented an organizational client, general knowledge of that client's policies and practices "ordinarily" will not preclude a subsequent representation. *Id.* (citing Rule. 1.9, cmt. 3). Rule 1.11, addressing the specific issue of conflicts of interest for former government lawyers, makes explicit that former government lawyers, putting aside the separate issue of having received confidential information, are disqualified only from particular

11

matters in which the lawyer participated personally and substantially and do not extend "to all substantive issues on which the lawyer worked." Rule 1.11, cmt. 4.

Consistent with the City's general approach of citing materials with little or no argument and expecting the court to figure out what use to make of the materials, the City cites to a brief transcript of an oral ruling by Judge Pallmeyer, disqualifying Devlin Schoop from representing the plaintiff in a case raising *Monell* claims, due to his prior employment as a supervisor in the Corporation Counsel's office. Mot. to Disqualify 9 (citing *Mack v. City of Chicago et al.*, No. 19-cv-04001). The City directs the court to the briefs and background materials on CM/ECF but does not make any argument. It is not the court's job to read the briefs and try to figure out how much that case, *Mack v. City of Chicago*, is like or unlike this one. It is the City's job to make arguments it deems appropriate, not the court's. *See United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam) ("Judges are not like pigs, hunting for truffles buried in briefs"). If Judge Pallmeyer's case is relevant to this one, the City has waived any argument to that effect by failing to make it. *See Beavers, supra* 756 F.3d at 1059.

The City engages in rhetoric such as the following:

> Mr. Marsh acquired confidential and privileged information about the City while working in the Department of Law. This information is 'confidential government information' for the purposes of Rule 1.11(c) because the City has a legal privilege not to disclose it. For example, as a supervisor, Mr. Marsh was privy to internal policies created for the purpose of defending against *Monell* allegations concerning a code of silence, failure to train, failure to supervise, and failure to discipline. [Citing Ex. B to the Motion to Disqualify, the Declaration of Carolyn Fronczak]. Mr. Marsh also had direct access to the CIT program documents and personnel as it was being implemented between 2006 and 2013.

Mot to Disqualify 14. [5]

---

[5] A careful reading of the City's Motion exposes many similar instances where the City claims that Marsh "had access to confidential internal affairs documents" or "had the ability to request non-redacted copies of almost any document from CPD besides documents involving confidential informants." (Mot. to Disqualify 12.) Did he ever

The court finds this description too general and too conclusory to provide a basis for disqualifying Marsh. Further, given the information the court has about Marsh's prior experience, the City's general arguments are unlikely to stand up to scrutiny. The prior case on which the City focuses its argument is *Paine*. But the *Monell* claims in *Paine* were bifurcated and stayed early in the case, not subject to discovery and never litigated. Did Marsh conduct an investigation of the CIT program in his spare time, as a hobby? The court does not know, but it is not clear why he should have done so as part of his work in *Paine*. Nor is it clear what Marsh did, as opposed to Matthew Hurd. Mr. Hurd has averred that he was the lead litigator on *Paine* and does not recall Marsh being involved in litigation or discovery practice relating to the plaintiff's *Monell* claims or the issue of mental health policies and training. Hurd Decl. ¶¶ 4–5, ECF No. 103-4, Ex. D. Marsh similarly has no recollection of working on the *Monell* claims in *Paine*. Marsh Decl. ¶ 9, ECF No. 103-1, Ex. A. The City argues in its Reply that "Mr. Marsh's lack of memory regarding *Monell* litigation does not cure the conflict," Reply to Mot. to Disqualify 1, but the question which must be addressed first is *where is the conflict*? The City has the burden here.

At its most specific, the City argues that in *Paine*, the plaintiff "sought depositions of witnesses concerning the CIT program" as well as Federal Rule of Civil Procedure 30(b)(6) deposition testimony regarding dealing with and assessing people with mental illness. Reply to Mot. to Disqualify 4, ECF No. 104. Lt. Jeffrey Murphy, a CIT witness listed by both parties in *Paine*, was noticed for a deposition to testify about the CIT program. *Id.* The City does not make clear whether such deposition[s] actually took place, nor does it make clear which City lawyer prepared or represented any such witness[es]. Assuming these depositions took place,

---

utilize such access or make such a request? The City provides no hint or any basis for understanding why he would do so in a case where the *Monell* claims were bifurcated, stayed and never litigated.

and assuming Marsh had anything to do with them, the City does not tell the court what, if any, nonpublic information which is still relevant 11 years later was involved. Again, the City need not disclose confidential, currently non-public information, but it should be possible to make clear what Marsh's involvement with these depositions was and the general nature of any confidential information involved. Without that modest level of detail, neither an adversary presentation nor a responsible court ruling is possible.

Marsh points out in his declaration that since he left the City in 2016, there have been two different Corporation Counsels (Marsh worked under Mara George and Steve Patton; Patton left after Marsh and was replaced first by Edward Siskel and then Mark Flessner). Marsh Decl. ¶ 5, ECF No. 103-1, Ex. A. Both deputies, all of the chiefs and virtually all of the supervisors have left the office since Marsh left. *Id*. When Marsh left, complaints against police officers relevant to *Monell* claims were handled by IPRA, the Independent Police Review Authority, but subsequently, IPRA was replaced by COPA, the Citizen Office of Police Accountability. *Id*. ¶ 18. Of course, a new mayoral administration took over in 2019, promising, as the news media made clear, a new era of police accountability. Mayor Lightfoot had previously spent three years as Chair of the Police Accountability Task Force which publicly addressed many of the subject areas (such as the code of silence) which, according to the City, Marsh's work involved. The City has made no effort to give the court any way to determine what if any confidential information Marsh was given or whether any such information, either as part of prior cases or since, has been made public.

Forced to acknowledge these many recent upheavals in the City's management of police-related matters, the City makes the argument that between December 2013, when *Paine* settled, and October 25, 2019, when Marsh appeared in the instant case, the City's approach to dealing

14

with mental health crises of its citizens was unchanged, and that from January 2016, when Marsh left the City's employ, to the date he appeared in this case, *nothing changed* in Chicago concerning police practices. This simply beggars belief. Maybe the court needs to become more cynical, to see all these changes in personnel, procedures, agencies, and mayoral administrations as mere window dressing. But even the sheer passage of time can be expected to have changed *something*.

The bottom line is that the City's Motion is too vague, the time elapsed too long, the personnel and City administration changes too significant, and the idea that despite the passage of so many years, nothing of any importance has changed is too incredible to give the court enough to find that the City has carried its burden to show Marsh must be disqualified because of his involvement in *Paine*. Beyond *Paine*, the City has failed to show that Marsh's involvement in other cases, either on behalf of individual officers or on behalf of the City, was factually related to the case at bar, such that there is any appreciable risk that he received confidential information that could advance plaintiff Bonds's case.

The motion to disqualify is therefore denied.

*Plaintiff's Motion to Strike the Declaration of Caroline Fronczak*

Bonds has moved separately to strike the declaration of Carolyn Fronczak, attached as an exhibit to the City's Motion to Disqualify. ECF No. 105. The parties spar over whether Fronczak has personal knowledge of the things she avers. *See* Fed. R. Evid. 602. It is clear— and would be to anyone looking at the issue objectively—that to some extent she does and to some extent she does not. But the key issue, as far as the court is concerned, is whether all the things she says that Marsh had direct access to as they relate to the specific cases on which he worked ("case evaluation and litigation strategies; settlement evaluation and strategies; internal

15

affairs documents; training materials; and privileged communications with defendant officers regarding *Monell* allegations that would be included in a joint defense privilege") are recent enough, unchanged enough from then to now, and factually related to the *Bonds* case enough to make any such case and *Bonds* "the same or a substantially related matter" such that confidential information obtained in those prior representations could be used in this case to the advantage of Bonds and to the disadvantage of the City. Rule 1.9 (a); Mot. to Disqualify 4. Fronczak's highly generalized description of these things, like the City's briefing, fails to carry the City's burden. The court need not strike the declaration to find that given the analysis required by the Seventh Circuit's *Watkins* case, *supra,* it does not help resolve the issue at bar. The motion to strike is therefore denied.

## **CONCLUSION**

The City's Motion to Disqualify [100] and Bonds's Motion to Strike the Declaration of Carolyn Fronczak [106] are denied.


ENTERED this 1st day of April 2020.

/s/
Joan B. Gottschall
United States District Judge
